**2005 WY 40**

**In the Matter of the Worker's Compensation Claim of Calvin D. PHILLIPS, Appellant (Petitioner),**

v.

**TIC—THE INDUSTRIAL COMPANY OF WYOMING, INC., Appellee (Respondent).**

**No. 04–58.**

Supreme Court of Wyoming.

April 8, 2005.

Representing Appellant: David M. Gosar, Jackson, Wyoming.

Representing Appellee: Timothy M. Stubson of Brown, Drew & Massey, LLP, Casper, Wyoming.

Before HILL, C.J., and GOLDEN, KITE, and VOIGT, JJ., and KAUTZ, D.J.

VOIGT, Justice.

[¶ 1]   On June 14, 2001, Calvin D. Phillips (the appellant) injured his back in the course of his employment with The Industrial Company of Wyoming, Inc. (the appellee).  The Wyoming Workers' Safety and Compensation Division (the Division) awarded the appellant temporary total disability benefits in October 2001.  The appellee objected to this award and a contested case hearing ensued.  The hearing examiner decided that the appellant's temporary total disability benefits should cease as of April 1, 2002, because the appellant had reached maximum medical improvement (which term may be used interchangeably with the term "ascertainable loss").  The appellant appeals from that determination.  We affirm.

## ISSUE

[¶ 2]   We find the dispositive issue in this appeal to be whether the record contains substantial evidence to support the hearing examiner's finding that the appellant had an ascertainable loss by April 1, 2002.

## FACTS

[¶ 3]   In May 2001, the appellant, age sixty, began working for the appellee near Lys-

ite as a "millwright helper" and maintenance worker.[1] On June 14, 2001, the appellant injured his lower back at work while emptying twenty-five gallons of fluid from a fifty-five gallon drum. The appellant continued to work after the injury, with some restrictions,[2] until he was "laid off" on August 24, 2001.

[¶ 4] The appellant ultimately sought medical attention for back pain and left leg pain (extending downward to the knee).[3] He was prescribed a conservative treatment regimen including anti-inflammatory medication, pain medication, two steroid injections,[4] and physical therapy.[5] According to Dr. Clayton Turner, the appellant's treating orthopedic surgeon, the appellant did not progress satisfactorily in this treatment regimen. A July 11, 2001, MRI revealed that the appellant had a "small left paracentral disc herniation arising from the L4/L5 disc, impinging upon the origin of the left L5 nerve root." On October 29, 2001, Dr. Turner performed a "surgical decompression ... partial discectomy at L4–5" to remove a portion of the disc and relieve the pressure on the nerve.

1. The appellant described the physical demands of his duties as a mixture of "light" and "heavy;" he estimated that about seventy percent of his duties were heavy and thirty percent of his duties were light or moderate.

2. The appellant stated that he initially was released to return to light duties. He apparently spent a few days in a tool trailer repairing tools and then continued with his usual employment (excluding heavy lifting) until August 24, 2001, without missing a day of work.
   The medical releases contained in the record indicate that on June 28, 2001, and August 1, 2001, the appellant was released to return to full duty with "attention given to not aggravate the injury." In order to clarify some apparent confusion regarding the appellant's work status pursuant to these releases, an October 3, 2001, letter states that the appellant "was able to return to work full time, but with the restrictions of no repetitive stooping, bending, twisting, reaching, climbing or overhead work and no lifting over 20 pounds."

3. Prior to the June 14, 2001, injury, the appellant never sought or received medical treatment for lower back pain.

4. The appellant had steroid injections on August 8, 2001, and September 7, 2001. He stated that he experienced relief from the first injection, but

[¶ 5] According to the literature Dr. Turner provides his patients regarding surgery of this nature:

A lumbar discectomy is an operation to remove pressure on a nerve in your spine.... Removing the fragment of herniated disc material pressing on the nerve root subsequently eliminates the pressure on the nerve.

The general purpose of considering this approach is to relieve the leg pain due to an irritated nerve, usually due to a herniated disc.... It is critical that patients understand that any patient with the above-mentioned herniated disc ... actually has two underlying spinal problems. The first problem is a tear in the disc ... causing back pain. The second problem is the pressure on a nerve in your spine, which causes leg pain.

The discectomy ... allows removal of the pressure on the nerve, which nicely relieves leg pain. However, the other problem is not treated and any back pain present before the operation is likely to continue after the operation.

the second injection had no effect. According to the appellant, his symptoms then got "progressively" worse.

5. Physical therapy records from this time period indicate that the appellant presented June 26, 2001, with lumbar spinal pain, decreased range of motion and increased pain with activity, a dysfunctional gait, and decreased lumbar spine stability. On June 29, 2001, the appellant experienced no pain with activity (the pain had gradually decreased since June 26), the appellant participated in light duty work June 27–28, and participated in full duty work June 29 with no pain or difficulty. According to the records: the appellant ambulated and moved with ease and no pain substitutions, range of motion was pain free, spinal motion was smooth and symmetrical, the appellant understood the potential for reinjury, all patient goals had been met, the appellant was able to return to work full time with no symptoms, and the appellant was to return to the clinic upon experiencing any pain or discomfort in his lower back or if he wanted to continue with a lumbopelvic stability program. Obviously, these records contain additional medical shorthand we are not able to interpret in the absence of expert assistance.

Most patients complain of both back and leg pain. Discectomy is a reasonable approach if the patient's primary complaint is leg pain and the patient feels that the back pain present before surgery is tolerable. If back pain itself is substantial and not tolerable then a fusion may need to be considered. The primary reason to consider a discectomy alone (to relieve leg pain only and tolerate back pain) and avoid a fusion is that the recovery from a spinal fusion is quite prolonged. Any spinal fusion requires six to nine months of recovery with considerable activity restriction, whereas recovery from a discectomy takes only four to six weeks.

. . .

Post–Laminectomy Syndrome: One possible complication is worsening of the back pain present before surgery, which is known as Post–Laminectomy Syndrome. This occurs in approximately 5–10% of patients who undergo lumbar discectomy. If worsening of back pain is substantial then a fusion operation may be necessary in the future.

. . .

Patients routinely experience a dramatic, remarkable reduction in their leg pain. . . .

. . . As stated in the introduction, persistence of the back pain present before the operation is expected. Increased pain with prolonged sitting and driving is expected as well. As per the other activities described above, slowly increase your exposure to these activities and expect decreased discomfort with time.

LONG–TERM RESTRICTIONS

There are no long-term restrictions with regards to recreational athletics. In general, I recommend that you develop the habit of bending at the knees and not the spine to preserve spinal function and avoid additional spinal injury at the same or another level in the years ahead. For heavy laborers, specific complex rehabilitation may be necessary and work return is

variable. Return to physically demanding work that involves regular heavy lifting, bending and twisting is not recommended. "Fusion" is defined in this literature as "growing together of the two bones surrounding an injured disc so that painful motion is stopped."

[¶ 6] The appellant reported that his left leg pain almost instantly disappeared following the discectomy. His medical records indicate that on November 7, 2001, he was "doing very well" and had "active full range of motion of his lower extremities. . . ." The appellant was advised to avoid lifting more than twenty to thirty pounds, to avoid repetitive stooping, bending, twisting or lifting for the next four weeks, to increase his daily activities as tolerated, and to walk as much as he would like; if the appellant had minimal to no back pain six weeks after the surgery, he could resume vigorous physical activities and do whatever was within his comfort level.[6]

[¶ 7] The appellant stated that he felt "[g]ood, but not all the way right" after the discectomy. On December 4, 2001, medical records indicate that the appellant was "doing very well" but complained of "some increased pain in his back and across his left hip." The appellant exhibited guarded active range of motion of his back and his back was "bothersome" when he engaged in "repetitive stooping, bending, twisting to include cleaning around the house or yard." According to Dr. Turner, it is "not uncommon after discectomy type procedures that patients will experience back pain." The appellant was placed on medication and instructed to avoid repetitive stooping, bending, twisting or lifting for four weeks. The appellant reported that the medication did not help and that his pain had increased as of December 12, 2001.

[¶ 8] On December 20, 2001, the appellant still had a "deep" backache, frequent discomfort in the lower back with radiation in the left buttock, and was advised to pursue physical therapy and resume anti-inflammatory medication. Physical therapy records indi-

6. Dr. Paul Ruttle, another orthopedic surgeon, testified that in his experience, recovery after surgery varied but most patients were capable of some degree of daily living activity within a month or two, were capable of light duty work within one to two months, were capable of full duty within four to six months, and fully recovered after about a year.

cate that as of December 24, 2001, the appellant was experiencing lower back pain associated with his initial injury and all lumbar spine movements were "rachet like & non-fluid." The therapist noted decreased lumbopelvic dynamic stability, decreased lumbar spine range of motion, decreased pain with activity, increased swelling in the lumbar spine, and that Dr. Turner was "contemplating fusion" if physical therapy was not successful. The appellant was to continue physical therapy three times per week for six weeks.[7]

[¶ 9] On January 17, 2002, the appellant reported that he had "good" days and "bad" days, ongoing mechanical back pain, and the ratcheting effect continued. His medical records state that this was most likely "discogenic" in nature and that he was to continue the conservative treatment regimen for another month.[8] The appellant's January 29 medical records note persistent back pain and intermittent right hip and thigh pain. On February 21, 2002, the appellant reported mechanical back pain and "ratcheting sensation ... when getting up" and the medical records attribute this to "ongoing discogenic back pain." The appellant was advised to continue with physical therapy and medication for another two months, although the

record only reflects that the appellant attended physical therapy until March 4, 2002.[9]

[¶ 10] The appellant testified that his physical activity to this point varied. For the first four months or so after the discectomy, the appellant engaged in very little activity aside from walking and physical therapy. At some point, the appellant attempted housework such as the dishes, vacuuming, and cleaning. These activities apparently "caused a problem" and the appellant stated that his doctor told him "not to do that." He also tried to lift a bale of hay and "found that that was not the thing to do." The appellant's wife, Cathy Phillips, stated that the appellant was "in too much pain to do most things. And any of the outdoors chores, I always did them"; most things "required bending or lifting something, and it couldn't be done." She added that after the discectomy, the appellant used pain medication and she did not "know that ... he was ever going to get better. It didn't seem like it."

[¶ 11] In March 2002, TIC hired a private investigator to surveil the appellant. The investigator summarized her observations as follows:

> During a three-day surveillance of· [the appellant] conducted 04/01/02–04/03/02 at

---

7. Physical therapy records indicate that the appellant was sore December 25, but less sore during therapy December 26. On December 28, the appellant had pain about the same intensity as December 26, and was to continue with the stability program as tolerated. He reportedly was very sore on December 29 through December 31, experienced less pain with medication, and only completed exercises that did not increase his pain. On January 2, 2002, the appellant reported pain at the L4–S1 level, radiating left to right. On January 4, he reported a significant decrease in pain. On January 7, the appellant was very sore after herding two cows that got out of the pasture. Prior to this, the appellant was "feeling okay." On January 9, the appellant was still sore. On January 11 and 16, the appellant reported less pain, and on January 18, the appellant was very sore but had not taken any pain medication.

8. Physical therapy records indicate that on January 21, 2002, the appellant reported he had "good days" and "bad days," with less pain than his previous visit, and was avoiding activities and positions that increased his pain. On February 1, the appellant noted a significant increase in back pain, and experienced another "bad day"

February 4 with no change in his level of activity. He had no new complaints on February 6, and on February 8, the appellant felt "pretty good" with medication, tolerated exercise well, and felt better than he had in "a long time" (most likely, according to the records, due to increased medication). On February 11, the appellant reported that he knew the pain was there but it was not "stabbing" pain. He stated on February 13, that he experienced much less pain during the last week and was still on medication. On February 15, the appellant reported an increase in pain but no change in his activity. On February 20, he stated that the pain "[was] there," but much less so than in the previous two or three weeks.

9. Physical therapy records indicate that on February 22, 2002, the appellant reported less pain in his lower back and he exhibited improvement in exercise tolerance. On February 25, the appellant's lumbar spine musculature was less tender. The appellant claimed that he was sore the evening of February 25 and that he experienced difficulty while standing up from the couch. On March 1, the appellant did not take his pain medication and was "very sore." On March 4, the appellant reported that he had experienced less soreness each day since March 1.

his residence in Riverton, WY, investigator established that he is actively engaged in the care and light exercise of ten horses, a flock of chickens and turkeys, and two dogs. He is assisted in this by an unidentified female, presumably his wife Kathy.

Investigator observed the [appellant] bending, pulling, pushing, reaching above his head, walking, driving—including entering and exiting his vehicle, lunging a horse, and performing tasks related to the rudimentary care and feeding of farm animals. The [appellant] appeared to perform all activities without signs of obvious pain or discomfort. He appeared to move with a normal gait and in a manner consistent with his age. He does not have a noticeable limp, although it is possible that he does favor his right side in a small way.

Over this three day period, the [appellant] was active each morning from about 09.00 am until noon or 1.00 pm. He then retired to his house and reappeared when the unidentified female returned at about 05.00 pm. They then spent half an hour doing the evening chores.

[¶ 12] In her report, the investigator provided more specifics regarding the appellant's activities, which activities (according to the investigator) the appellant performed with "no trouble," no "signs of pain or discomfort," and no "grasping of his back." Additionally, the investigator videotaped the appellant performing various activities.

1. The appellant raked around the henhouse entrance and reached "up to remove a block from the chicken door";

2. Hooked up a horse trailer to a truck and later unhooked the trailer ("bending down from the waist to unfasten the two safety chains");

3. Opened the truck's hood when it broke down;

4. Walked one-half mile up a "slight rise";

5. Filled the stock tanks with a hosepipe and placed a heater into the tanks;

6. Pushed a Jeep forward several inches into the garage and walked back to the house "seemingly with no obvious signs of pain or discomfort";

7. Led a horse to the corral, lunged it on the left leg (held "lunge rein in his left hand and carrie[d] a lunge whip . . . in his right" and "crack[ed] the lunge whip" behind the horse), and worked with the horse for another twenty minutes; and

8. Pulled a Mormon cart to a haystack, carried one-third bale of hay "as a waiter would carry a tray of drinks," threw hay into pen, entered pen, and distributed the hay, pulled another bale down from head height, lifted it up, and loaded it onto cart.[10]

[¶ 13] The appellant testified that by this time (approximately six months after the discectomy), his condition had improved "considerably"; he was feeling "pretty well," was "frisky" and relatively free from pain. The appellant claimed that at some point thereafter, his back pain started "getting bad" and "going bad again. And that's why the second surgery." Yet, the appellant also testified that he still experienced pain (some "days a great deal, some days not"—"there's good days, and then there's bad days") and while the pain had "diminished" at one point, it "was there all the time" and "just never went away."[11] The appellant's wife echoed this testimony in that the appellant was feeling better "most of the time" but not all of the time; she did not feel that the appellant's condition "worsened," it "just never got better."

[¶ 14] The appellant further explained that his physical activity had increased and he "got to doing more and more things." The appellant acknowledged that he tried to feed his horses "once,"[12] (April 1, 2002) but

---

10. According to Cathy Phillips, she and the appellant fed their horses oat hay, which hay was "very dry," had been sitting all winter, and made for "pretty light" bales (not over thirty pounds). The appellant testified that one of these hay bales weighed thirty-five pounds.

11. At one point, the appellant theorized that his pain fluctuation was due to the weather because

on a chilly day he was "pretty uncomfortable" and on a warm day, he experienced minimal pain.

12. Cathy Phillips recalled that the appellant attempted to feed the horses in the springtime "when he was supposed to be trying to do some things." He told his wife that he "shouldn't have

when he was distributing the hay, his back began "hurting pretty bad" and he "quit." The appellant claimed to have been very sore and spent most of the next day "on the couch." He also admitted that he lunged the horse and that he experienced no discomfort or physical restrictions that interfered with his ability to do so. Cathy Phillips testified that she did not think the appellant was successful in being more active because he was still hurting a lot and it was hard for him to bend. There is obviously some contrast between this testimony and what the investigator observed and recorded.

[¶ 15] On May 2, 2002, Dr. Turner noted that the appellant was "not doing well" and was still "complaining of ongoing back pain as well as a ratcheting type sensation.... We have previously discussed various treatment options available including possible additional surgery such as a fusion. So far he has failed to improve with physical therapy." The appellant's range of motion was restricted secondary to discomfort, Dr. Turner suspected post-discectomy syndrome, and the appellant was "going to need to consider a fusion at the L4–5 level...."

[¶ 16] The appellant underwent fusion surgery June 26, 2002:

> [Appellant:] Why did I think about the second surgery?
>
> [Appellant's counsel:] Yes.
>
> A. Well, the first one having done so well, but I knew it wasn't right because I wasn't yet back to where I was prior to the injury. So my thoughts were—and we had talked about this with Dr. Turner, he and I, that down the road this second one may be necessary.
>
> And then I thought if the first one did so well, the second one—and that's still my hope—will eliminate the problem altogether and then I'll be back to being—I'm a worker. I like to work. I want to go back to work. And so I thought, okay, I'll do the second one and then I'll be okay.
>
> . . .
>
> Q. How have you felt since that surgery?

> A. On again, off again. I'm never—not in constant real hurtful pain but a reminder that it's there. But some days okay, some—like today, I feel good today.
>
> . . .
>
> Q. How do you feel now as compared to—and I mean in general, not necessarily today—as compared to how you felt before your surgery, your second surgery?
>
> A. Before the second surgery, how do I feel now. Better, after the second one.
>
> Q. Okay, how so? Can you explain a little bit?
>
> A. Well, I haven't tested myself at this point in time to see what my mobility and everything is going to be, but I feel better in here, that—that in the end, this will take care of it. I haven't started physical therapy, so I don't know my limits.

[¶ 17] According to Cathy Phillips, the appellant considered the fusion surgery "because he wanted the pain gone because it hurt prior to surgery a lot. And he had a lot of confidence that this was going to fix things and he would be able to go back to work, which is what he was wanting to do." She added:

> [Appellant's counsel:] What about the second surgery, has that seemed to have helped him?
>
> A. I guess it's hard to say because it was a more serious surgery and it's still real soon. I think he tries real hard to get around. Some days he's got less pain, you know, some days it still hurts like crazy.
>
> Q. Do you know if he's using as much medication as he did prior to the surgery?
>
> A. As far as I know he is, yeah.
>
> Q. Does he seem to be improving?
>
> A. I think in getting around maybe. I don't know if it hurts less. I know a lot of times you can tell it hurts a lot. He doesn't say it hurts, he doesn't express that, but just I can tell the way he gets up or when he groans or something that it's got to be hurting. I think it's probably getting better overall, but it's also too soon.

tried that" and she did not recall him trying to

feed the horses again.

[¶ 18] Dr. Turner was deposed in this matter on May 31, 2002. As of that date, Dr. Turner testified that: (1) the discectomy essentially relieved the appellant's localized left leg pain; (2) the appellant's subsequent back pain was related to his original disc injury and originated at the same level of the back; (3) Dr. Turner's "impression at this point [was] that [the appellant] basically [had] an incompetent disk, [and was] structurally not able to maintain stability at that level of his spine and causes his back pain"; (4) after a discectomy, "the disk is not normal and will never return to being a normal disk" and "after this type of surgery, [most patients] are going to have a problem disk at that level of their spine"; and (5) the appellant had a "fairly poor prognosis." One could expect nine to twelve months of recovery from fusion surgery and Dr. Turner was "doubtful" that the appellant would be able to return to a physically demanding job after the fusion. Dr. Turner elaborated:

[Appellant's counsel:] Has Mr. Phillips reached, in your opinion, his maximum medical improvement yet?

[Dr. Turner:] In my opinion, no.

Q. Is a fusion surgery necessary for him to reach maximum medical improvement?

A. I wouldn't say it's necessary. If he is unwilling to consider a fusion, then I believe he has reached maximum medical improvement.

Q. If he is willing to consider a fusion, is there a possibility that he could improve further from his present condition?

A. Yes.

. . .

[Appellee's counsel:] Was there particular reason why a discectomy was done and not a discectomy and fusion during your first surgery?

A. There really aren't indications for doing a discectomy and a fusion as the initial procedure in something [such] as a herniated disk. That was done about 30 years ago. Commonly shown it didn't lead to improved results in most patients.

Q. So in someone that has a herniated disk like this, your typical procedure is to go in and do the discectomy, and that's it?

A. Yes.

Dr. Turner apparently did not review the surveillance videos and was not asked for any opinions, hypothetical or otherwise, in that regard.

[¶ 19] Dr. Paul Ruttle, an orthopedic surgeon retained by the appellee, was deposed in this matter on August 7, 2002. Dr. Ruttle examined the appellant on June 11, 2002, and reviewed the appellant's medical records and other materials. During his physical examination of the appellant, Dr. Ruttle noted "normal" strength in the appellant's lower extremities, that the appellant's range of motion was "somewhat restricted," and that the appellant experienced "pain in his lower back when he forward flexed and when he extended his spine." According to Dr. Ruttle, his physical examination of the appellant was inconsistent with what he observed in the aforementioned surveillance videos:

A. Well, during the physical exam, Mr. Phillips was—noted difficulty bending forward to even 40 degrees, which is a little—which is a little less than half of what a patient should be able to forward flex, which is normally 85–90—80 to 90 degrees and he did—when he did that during [the] physical exam [he] experienced pain.

During the Sub-rosa videos dated April 1st and 2nd, 2002, he was seen forward flexing while feeding chickens. He was able to bend with bales of hay and do all sorts of other activities on the range there.

[Appellee's counsel:] What particular activities that you saw in those videos were inconsistent with what he displayed during his physical examination?

A. Well, not only could he forward flex easily while performing activities such as feeding chickens, he was able to forward flex on a repetitive basis, move forward, bend forward, straighten up, move forward, bend, straighten up on multiple occasions followed one right after another without a single evidence of pain.

. . .

Q. In your review of these videos and Mr. Phillips' activities, did you see motion or any other evidence of pain in reviewing his activities?

A. No.

Q. In speaking with Mr. Phillips, did he make any representations to you about his lifting abilities?

A. Yes.

Q. And what were those representations?

A. Stated that he was able to lift only approximately 20 pounds.

Q. Okay. And, again, is that consistent with what he demonstrated on the video that was taken a couple of months before you saw him?

A. No.[13]

Q. In your discussions with Mr. Phillips, did he talk to you at all about the course of his back pain, whether it had improved steadily or whether it had gotten worse or stayed the same?

A. He stated that the back pain and buttock pain on the left along with proximal side pain had continued since the operation.

Q. In those videos that you were able to see, did you see Mr. Phillips handling horses, lunging horses?

A. Yes, I did.

Q. Could you give us a little bit of description on what kind of demands that sort of activity has on the lower back?

A. Well, it has a number—there is a number of problems with that activity, first of all, standing, and then, if you recall on the Sub-rosa videos, twisting while he's maneuvering the horse. He's also holding his arms out in front of him, which tends to shift a significant amount of force sort of anteriorly to the front of the spine, and that can have in a significantly compromised spine a painful effect.

Q. Would you expect somebody with the type of back injury that Mr. Phillips described to you in your examination to be able to do that kind of activity?

A. Yeah, they might be able to do that activity but they would certainly have a lot more pain or would represent to have a lot more pain. But he seems to be doing it quite comfortably.

Q. Given your experience with patients that have undergone the same kind of treatment as Mr. Phillips and your physical examination of him as well as the review of medical records and the videos, do you have an opinion regarding when Mr. Phillips would have been able to return to light duty following the surgery he underwent in October of 2001?

A. Assuming surgery—well, the surgery, we'll say—roughly say November 1st. He should have been able to go back to some light duty January 1st.

Q. Okay. And what about returning to work in some sort of—in a full-duty capacity, the kind of work that he had been involved in prior to his workplace injury?

A. I would say certainly after reviewing the Sub-rosa video that he should have been able to do that by—by April 1st, 2002.

[¶ 20] With respect to the appellant's fusion surgery, Dr. Ruttle testified as follows:

[Appellant's counsel:] All right. Am I correct that in your report, Doctor, you express the opinion that Mr. Phillips may not be helped by a spinal fusion? Is that correct?

A. Well, I—I—at this point after reviewing that video, I—I can't see how a spinal fusion is going to help a patient with that degree of activity.

Q. All right. Would your opinion be affected at all by the knowledge that Mr. Phillips did, in fact, undergo a spinal fusion on the 26th of June and since that time his symptoms have greatly declined or possibly ceased altogether?

A. I have no independent knowledge of that.

Q. All right. And hypothetically, how would that affect—would that knowledge affect your opinion?

13. The appellant later testified at the contested case hearing that he made this representation consistent with his doctor's recommendation, not in order to represent his actual lifting ability.

A. I don't know. I would have to look at the patient. I really—I really can't answer that hypothetical.

[¶ 21] Several applications for temporary total disability benefits appear in the record:

1. On September 14, 2001, Dr. Turner certified that the appellant was able to return to modified duty and to avoid repetitive stooping, bending and twisting, that surgery was not indicated, and in his professional medical opinion the appellant would be temporarily totally disabled from August 25, 2001 to September 30, 2001. Dr. Turner additionally testified that if the appellant had not had light duty work available in June 2001, Dr. Turner would have certified the appellant for temporary total disability.

2. On October 24, 2001, Dr. Turner certified that the appellant was able to return to modified duty according to unspecified attached documentation and "no light duty after surgery," surgery was indicated on October 29, 2001, the appellant had not reached the point of ascertainable loss, and in his professional medical opinion the appellant would be temporarily totally disabled from October 1, 2001 to December 31, 2001.

3. On January 23, 2002, Dr. Turner certified that the appellant was not able to return to modified duty, surgery was not indicated, the appellant had not reached the point of ascertainable loss, and that in his professional medical opinion the appellant would be temporarily totally disabled from January 1, 2002 to February 28, 2002.

4. On February 27, 2002, Dr. Turner certified that the appellant was not able to return to modified duty, surgery was not indicated, and in his professional medical opinion the appellant would be temporarily totally disabled from March 1, 2002, to May 31, 2002. Dr. Turner did not answer the question as to whether the appellant had reached the point of ascertainable loss, and obviously this certification was prior to the aforementioned surveillance videos.

[¶ 22] Dr. Turner testified that given the appellant's physical condition on May 31, 2002, the appellant was not safely able to return to work in a physically demanding position. Dr. Turner apparently had never released the appellant to return to work since October 2001.

[¶ 23] The Division issued a final determination approving the appellant's application for temporary total disability payments in October 2001. The appellee objected to the Division's final determination and the case was referred to the Office of Administrative Hearings for a contested case hearing. A contested case hearing was initially set for April 25, 2002. The Division notified the hearing examiner on March 20, 2002, that it did not intend to appear for the hearing. A contested case hearing was ultimately held on September 9, 2002.[14] The hearing examiner found, in pertinent part, as follows:

1. The appellant was "temporarily totally disabled from August 25, 2001, until his surgery on October 29, 2001, and from October 30, 2001 during his recuperation from surgery."

2. A "video tape shows [the appellant] to be active and moving comfortably on April 1, 2002."

3. The appellant had "reached maximum medical improvement by April 1, 2002, unless he chose to undergo further surgery. Dr. Turner and Dr. Ruttle agreed that [the appellant] had reached maximum medical improvement by this date."

4. Temporary total disability benefits shall cease if the appellant has "an ascertainable loss or has reached a point of stability or recovery."

5. It was "clear the [appellant] had reached a point of stability and his temporary total disability benefits should be terminated. Dr. Turner agreed that [the appellant] had reached maximum medical improvement until he should elect to un-

14. Counsel for the appellee entered an appearance on April 2, 2002, and requested that the April 25th hearing date be continued because counsel was scheduled to appear for trial in another court that day. The hearing was continued, and reset for July 11, 2002. On July 8, 2002, counsel for both parties requested a continuance because they had not been able to schedule Dr. Ruttle's deposition prior to the hearing date. The hearing was ultimately reset for September 9, 2002.

dergo a fusion at the L4–L5 level of his spine."

6. The appellant should "receive temporary total disability benefits for the period of time he was disabled, specifically August 25, 2001, through April 1, 2002."

[¶ 24] In November 2002, the appellant petitioned the district court to review the hearing examiner's findings. In February 2004, the district court affirmed the hearing examiner. The appellant now appeals from the district court's decision.

### STANDARD OF REVIEW

[¶ 25] A claimant for worker's compensation benefits has the burden of proving all the essential elements of the claim by a preponderance of the evidence in the contested case hearing. *In Re Worker's Comp. Claim of Johnson,* 2001 WY 48, ¶ 7, 23 P.3d 32, ¶ 7 (Wyo.2001). We recently held that the substantial evidence test is the appropriate standard of review in appeals from Wyoming Administrative Procedures Act contested case proceedings when factual findings are involved and both parties submit evidence. *Newman v. Wyoming Workers' Safety and Comp. Div.,* 2002 WY 91, ¶ 22, 49 P.3d 163, ¶ 22 (Wyo.2002).... Because both parties presented cases-in-chief, we apply the substantial evidence standard. We afford respect and deference to a hearing examiner's findings of fact if they are supported by substantial evidence. *Haagensen v. State ex rel. Workers' Comp. Div.,* 949 P.2d 865, 867 (Wyo.1997). Our task is to examine the entire record to determine whether substantial evidence supported the hearing examiner's findings. *State ex rel. Wyo. Workers' Comp. Div. v. Waggener,* 946 P.2d 808, 814 (Wyo.1997). We will not substitute our judgment for that of the hearing examiner when substantial evidence supports his decision. *Id.* Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. *Id.* A hearing examiner's conclusions of law are afforded no special deference and will be affirmed only if truly in accord with law. *State ex*

*rel. Wyo. Workers' Comp. Div. v. Barker,* 978 P.2d 1156, 1159 (Wyo.1999).

*Hermosillo v. State ex rel. Wyoming Workers' Safety and Compensation Div.,* 2002 WY 175, ¶ 6, 58 P.3d 924, 926 (Wyo.2002). However,

[w]hen the party charged with the burden of proof has failed to meet that burden, we review the case under the arbitrary, capricious, abuse-of-discretion, or otherwise-not-in-accordance-with-law standard. *Brees v. Gulley Enterprises, Inc.,* 6 P.3d 128, 132 (Wyo.2000); *Keck v. State ex rel. Wyoming Workers' Safety and Compensation Div.,* 985 P.2d 430, 432 (Wyo.1999).

"Under the arbitrary, capricious and abuse of discretion standard, we are charged with examining the entire record. In our examination and review of a hearing examiner's determination, we defer to the hearing examiner's findings of fact. We will examine conflicting and contradictory evidence to see if the hearing examiner reasonably could have made its findings based on all the evidence before it. The findings of fact may include determinations of witness credibility, as the hearing examiner is charged with determining the credibility of the witnesses. In our review, we will not overturn the hearing examiner's determinations regarding witness credibility unless they are clearly contrary to the overwhelming weight of the evidence."

*Brees,* 6 P.3d at 132.

*In re Boyce,* 2005 WY 9, ¶ 6, 105 P.3d 451, 454 (Wyo.2005).

The hearing examiner, as the trier of fact, is charged with weighing the evidence and determining the credibility of witnesses.... "When presented with medical opinion testimony, the hearing examiner, as the trier of fact, is responsible for determining relevancy, assigning probative value, and ascribing the relevant weight to be given to the testimony." *Bando v. Clure Bros. Furniture,* 980 P.2d 323, 329 (Wyo. 1999). "In weighing the medical opinion testimony, the fact finder considers: (1) the opinion; (2) the reasons, if any, given for it; (3) the strength of it; and (4) the qualifications and credibility of the witness or witnesses expressing it." *Id.* at 329–30.

"Demonstrating evidentiary contradictions in the record does not establish the ruling was irrational, but we do examine conflicting evidence to determine if the agency reasonably could have made its finding and order based upon all of the evidence before it." *Id.* at 331.

*Baxter v. Sinclair Oil Corp.,* 2004 WY 138, ¶ 9, 100 P.3d 427, 430–31 (Wyo.2004).

## DISCUSSION

### Relevant Statutes

[¶ 26] Wyo. Stat. Ann. § 27–14–403(a) (LexisNexis 2001) provided, in pertinent part:

(a) In addition to payment of medical and hospital care [15] ..., an injured employee and his dependents may be entitled to one (1) or more awards for:

(i) Temporary total disability;

(ii) Permanent partial impairment;

(iii) Permanent partial disability or vocational rehabilitation as provided under W.S. 27–14–408;

(iv) Permanent total disability; or

(v) Death.

[¶ 27] The resolution of this appeal involves several interrelated statutes encompassing temporary total disability benefits, permanent partial impairment benefits, permanent partial disability benefits, and permanent total disability benefits. Wyoming defines "temporary total disability" as "that period of time an employee is temporarily and totally incapacitated from performing employment at any gainful employment or occupation for which he is reasonably suited by experience or training. The period of temporary total disability terminates at the time the employee completely recovers or qualifies for benefits under W.S. 27–14–405 or 27–14–406[.]" Wyo. Stat. Ann. § 27–14–102(a)(xviii) (LexisNexis 2001). The purpose of temporary total disability benefits is "to provide income for an employee during the time of healing from his injury and until his condition has stabilized." *Pacific Power and Light v. Parsons,* 692 P.2d 226, 228 (Wyo.1984).

[¶ 28] In that regard, Wyo. Stat. Ann. § 27–14–404 (LexisNexis 2003) further provides, in pertinent part:

(a) If after a compensable injury is sustained and as a result of the injury the employee is subject to temporary total disability as defined under W.S. 27–14–102(a)(xviii), the injured employee is entitled to receive a temporary total disability award for the period of temporary total disability as provided by W.S. 27–14–403(c). The period for receiving a temporary total disability award under this section for injuries resulting from any one (1) incident or accident shall not exceed a cumulative period of twenty-four (24) months, except that the division pursuant to its rules and regulations and in its discretion may in the event of extraordinary circumstances award additional temporary total disability benefits. The division's decision to grant such additional benefits shall be reviewable by a hearing examiner only for an abuse of discretion by the division.

(b) Any employee awarded benefits under W.S. 27–14–405 or 27–14–406 is not eligible for benefits under subsection (a) of this section unless the employee has returned to gainful employment and following employment, undergoes additional surgery not reasonably contemplated before the award for permanent impairment or disability and then only for a reasonable period of recuperation, confinement for medical care during the actual period of confinement or unless application is made and an award is granted under W.S. 27–14–605.

(c) Payment under subsection (a) of this section shall cease prior to expiration of the twenty-four (24) month maximum period specified under subsection (a) of this section if:

(i) Recovery is complete to the extent that the earning power of the employee at a gainful occupation for which he is reasonably suited by experience or training is substantially restored; or

---

**15.** Benefits for the appellant's medical and hospital care pursuant to Wyo. Stat. Ann. § 27–14– 401 (LexisNexis 2003) are not at issue in this appeal.

(ii) The employee has an ascertainable loss and qualifies for benefits under W.S. 27–14–405 or 27–14–406.

[¶ 29] "Permanent partial disability" is defined as "the economic loss to an injured employee, measured as provided under W.S. 27–14–405(j), resulting from a permanent physical impairment[.]" Wyo. Stat. Ann. § 27–14–102(a)(xv). In that regard, Wyo. Stat. Ann. § 27–14–405 (LexisNexis 2003) provides, in pertinent part:

(f) An injured employee suffering an ascertainable loss may apply for a permanent partial impairment award as provided in this section.

(g) An injured employee's impairment shall be rated by a licensed physician using the most recent edition of the American Medical Association's guide to the evaluation of permanent impairment. The award shall be paid as provided by W.S. 27–14–403 for the number of months determined by multiplying the percentage of impairment by forty-four (44) months.

(h) An injured employee awarded permanent partial impairment benefits may apply for a permanent disability award subject to the following terms and conditions:

(i) The injured employee is because of the injury, unable to return to employment at a wage that is at least ninety-five percent (95%) of the monthly gross earnings the employee was earning at the time of injury;

(ii) An application for permanent partial disability is filed not before three (3) months after the date of ascertainable loss or three (3) months before the last scheduled impairment payment, whichever occurs later, but in no event later than one (1) year following the later date; and

(iii) The employee has actively sought suitable work, considering the employee's health, education, training, and experience.

[¶ 30] "Permanent total disability" means the "loss of use of the body as a whole or any permanent injury certified under W.S. 27–14–406, which permanently incapacitates the employee from performing work at any gainful occupation for which he is reasonably suited by experience or training[.]" Wyo. Stat. Ann. § 27–14–102(a)(xvi). In that regard, Wyo. Stat. Ann. § 27–14–406 (LexisNexis 2003) provides, in pertinent part:

(a) Subject to W.S. 27–14–602, upon certification by a physician licensed to practice surgery or medicine that an injury results in permanent total disability as defined under W.S. 27–14–102(a)(xvi), an injured employee shall receive for eighty (80) months a monthly payment as provided by W.S. 27–14–403(c) less any previous awards under W.S. 27–14–405 which were involved in the determination of permanent total disability, and dependent children shall receive an award as provided by W.S. 27–14–403(b). . . . An employee shall not receive benefits under this section if receiving benefits under W.S. 27–14–404 or 27–14–405.

*Analysis*

[¶ 31] The appellant argues that the hearing examiner's decision to terminate temporary total disability payments as of April 1, 2002, was premature because the appellant's fusion surgery was "imminent" and the appellant's condition would "likely change if he had back fusion surgery." Accordingly, the fact that the appellant underwent a subsequent fusion surgery precluded the determination of any "final" ascertainable loss (as opposed to an "interim" period of stability between surgeries) and a permanent impairment rating was therefore "impossible" (and in fact had never been formally assigned). The appellant contends that the record did not contain substantial evidence that the appellant had an ascertainable loss by April 1, 2002, and that the hearing examiner misapplied Wyo. Stat. Ann. § 27–14–404(c)(ii) in denying the appellant temporary total disability benefits.

[¶ 32] The parties focus their appellate arguments on the applicability of Wyo. Stat. Ann. § 27–14–404(c)(ii), which subsection provides that temporary total disability benefits "shall cease" prior to the statutory maximum period if "[t]he employee has an ascertainable loss and qualifies for benefits under

W.S. 27–14–405 or 27–14–406." The key issue for purposes of that subsection is whether the particular record in the instant case contains sufficient evidence [16] that the appellant had an ascertainable loss by April 1, 2002. An ascertainable loss is "that point in time in which it is apparent that permanent physical impairment has resulted from a compensable injury, the extent of the physical impairment due to the injury can be determined and the physical impairment will not substantially improve or deteriorate because of the injury[.]" Wyo. Stat. Ann. § 27–14–102(a)(ii).

[¶ 33] An "ascertainable loss" is "commonly measured at the point of 'maximum medical improvement.' " *State ex. rel. Wyoming Workers' Compensation Div. v. Gerdes,* 951 P.2d 1170, 1174 n. 1 (Wyo. 1997).[17] Generally, the

> commonest question is when does the "healing period" end and "stabilization" occur? The answer to this question—which is sometimes phrased as "when has maximum medical improvement (MMI) been reached?" or "when has the condition become stationary?"—determines in most states when temporary benefits cease and when the extent of permanent disability can be appraised, for purposes of making either a permanent partial or a permanent total award.
>
> . . .
>
> The issue may be a purely medical one. Thus, there may be medical evidence that the period of recuperation is not yet over, that further healing and strengthening may be anticipated, and that it is still too early to appraise claimant's permanent disability. Conversely, there may be medical testimony that the claimant has recovered as much as he or she ever will, and that any lingering disability is permanent. The fact that some treatment is still necessary, such as physical therapy or drugs, does not necessarily rule out a finding that the condition has become stabilized, if the underlying condition causing the disability has become stable and if nothing further in the way of treatment will improve that condition. But, if treatment was given in the hope of improving the condition, the later discovery that no improvement resulted does not bar a finding that the healing period persisted throughout the process of treatment. The persistence of pain may not of itself prevent a finding that the healing period is over, even if the intensity of the pain fluctuates from time to time, provided again that the underlying condition is stable.
>
> . . .
>
> The determination whether the period of temporary total disability has ended may also involve nonmedical facts touching claimant's employment situation.

4 Larson's Workers' Compensation Law § 80.03[2], [3], and [4] (2004) (footnotes omitted). We have said that in

> the usual case, temporary total disability will be awarded for a single initial period of recovery and stabilization. See *Pacific Power and Light v. Parsons,* Wyo., 692 P.2d 226, 228 (1984). Once stabilization occurs, the extent of permanent disability, whether partial or total, should be determined and the employee should receive an appropriate award.

*Parnell v. State ex rel. Wyoming Worker's Compensation Div.,* 735 P.2d 1367, 1368 (Wyo.1987).

[¶ 34] We find that the record in the instant case contains substantial evidence that the appellant had an ascertainable loss by April 1, 2002. It is undisputed that, in the absence of the appellant's fusion surgery, the

---

**16.** "The extent and duration of an employee's disability are questions of fact...." *Parsons,* 692 P.2d at 229.

**17.** The Division's rules and regulations currently define "maximum medical improvement" as a condition or state that is well stabilized and unlikely to change substantially in the next year, with or without medical treatment. Over time, there may be some change; however, further recovery or deterioration is not anticipated. This term may be used interchangeably with the term "ascertainable loss", defined in W.S. § 27–14–102(a)(ii).

3 Weil's Code of Wyoming Rules, *Department of Employment, Workers' Compensation Commission, Workers' Compensation Rules, Regulations and Fee Schedules,* ch. 1, § 4(t), 025 220 001–4 (2004).

appellant had already reached the point of ascertainable loss and/or maximum medical improvement. The only remaining consideration was whether the appellant's physical impairment would thereafter "substantially improve or deteriorate because of the injury," and the hearing examiner apparently felt that it would not.

[¶ 35] The fact that the appellant underwent a subsequent fusion surgery, alone, is not necessarily determinative, as both parties elicited medical testimony on the issue. The state of the record is as follows:

1. Dr. Ruttle, who physically examined the appellant, reviewed the appellant's medical records and other materials, and reviewed the surveillance videotapes, testified that he could "not see how a spinal fusion [was] going to help a patient with that degree of activity."

2. Dr. Turner testified that following a discectomy, the disc is not normal and will never return to being a normal disc. His literature indicates that a return "to physically demanding work that involves regular heaving lifting, bending and twisting is not recommended." In May 2002, Dr. Turner testified that the appellant had a "fairly poor prognosis" and could not safely return to a physically demanding position.

3. Dr. Turner testified that the appellant had reached maximum medical improvement unless he was willing to consider fusion surgery. However, Dr. Turner also testified that

a fusion was not "necessary" for the appellant to reach maximum medical improvement, that there was merely a "possibility" that the fusion would allow the appellant to improve further, and that he was "doubtful" that the appellant would return to a physically demanding job after the fusion.

[¶ 36] It was reasonable for the hearing examiner to conclude from this evidence [18] that **substantial** improvement would not have resulted from the fusion surgery. *See generally, for example, Myers v. F.C.A. Services, Inc.,* 592 N.W.2d 354, 358–59 (Iowa 1999); *Pitzer v. Rowley Interstate,* 507 N.W.2d 389, 391–92 (Iowa 1993); *Briggs v. Consolidated Freightways,* 234 Neb. 410, 451 N.W.2d 278, 282–83 (1990); *Baca v. Bueno Foods,* 108 N.M. 98, 766 P.2d 1332, 1334–36 (1988); *Emery v. Adjustco,* 82 Or.App. 101, 727 P.2d 622, 625 (1986); *Coburn v. Frank Dodge & Sons,* 165 Vt. 529, 687 A.2d 465, 467–68 (1996); *GTC Auto Parts v. Labor and Industry Review Com'n,* 184 Wis.2d 450, 516 N.W.2d 393, 398 (1994); and 82 Am.Jur.2d *Workers' Compensation* §§ 382–83 (2003).[19]

[¶ 37] Once the appellant reached the point of ascertainable loss in the instant case,[20] he essentially "qualified" for permanent partial impairment benefits. Wyo. Stat. Ann. § 24–14–405(f) provides that an "injured employee suffering an ascertainable loss may apply for a permanent partial impairment award as provided in this section." [21] Should the appellant actually apply

---

18. While the medical testimony could perhaps have been more thoroughly developed, we note that it "is not the burden of the employer ... to prove that a claimant is *not* entitled to a continuation of temporary total disability benefits"; rather, "the claimant has the burden of showing that he is entitled to a continuance of benefits." *Snyder v. State ex rel. Wyoming Worker's Compensation Div.,* 957 P.2d 289, 293 (Wyo.1998) (emphasis in original). *See also Shassetz v. State ex rel. Wyoming Workers' Safety and Compensation Div.,* 920 P.2d 1246, 1248–50 (Wyo.1996) and *Higgins v. State ex rel. Wyoming Workers' Compensation Div.,* 739 P.2d 129, 131 (Wyo.), cert. denied, 484 U.S. 988, 108 S.Ct. 508, 98 L.Ed.2d 507 (1987).

19. This does not mean that any period of stability between surgeries necessarily warrants a determination that a claimant has an ascertainable loss. That determination must rest on the particular circumstances and testimony in each case.

20. This case is somewhat unique because the issue regarding whether the appellant had an ascertainable loss arose in the context of terminating the appellant's temporary total disability benefits, rather than a substantive claim for permanent benefits. Several years have passed awaiting appellate resolution of the issue.

21. The Division's rules state that an initial application for permanent partial impairment benefits may be filed when a worker "has suffered an ascertainable loss as defined in W.S. § 27–14–102(a)(ii)" and the worker may thereafter apply for permanent partial, or permanent total, disability awards pursuant to Wyo. Stat. Ann. §§ 27–14–405 or 17–14–406 based "upon the rating given by the physician...." 3 Weil's Code of Wyoming Rules, *supra,* at ch. 5, § 4(d)(i) and (ii), 025 220 001–17. Similarly, to collect temporary total disability benefits beyond the maximum period allowed by statute, one must show, among

for such an award,[22] the amount of the award would of course be computed based on the degree of his permanent impairment. *See* Wyo. Stat. Ann § 27–14–405(g). The testimony of both Dr. Ruttle and Dr. Turner indicated that the degree of the appellant's impairment was capable of determination and neither party has satisfactorily articulated why, *for purposes of Wyo. Stat. Ann. § 27–14–404(c)(ii)*, the appellant would not have otherwise qualified for a permanent partial impairment award in the instant case.[23] *See generally also Higgins v. State ex rel. Wyoming Workers' Compensation Div.*, 739 P.2d 129, 132–33 (Wyo.), *cert. denied*, 484 U.S. 988, 108 S.Ct. 508, 98 L.Ed.2d 507 (1987) (termination of temporary total disability benefits under a prior version of the statute).

[¶ 38] Upon being "awarded" permanent partial impairment benefits, the appellant could then, subject to certain other conditions, potentially seek lost earnings in the form of permanent partial disability benefits.[24] *See* Wyo. Stat. Ann § 27–14–405(h). Neither the record, nor the appellant, indicates that the appellant's impairment was such that he was permanently, totally disabled pursuant to Wyo. Stat. Ann. § 27–14–406.

[¶ 39] The appellant could conceivably also seek total temporary disability benefits for the healing period following his fusion surgery pursuant to Wyo. Stat. Ann. § 27–14–605 (LexisNexis 2003):

(a) If a determination is made in favor of or on behalf of an employee for any

benefits under this act, an application may be made to the division by any party within four (4) years from the date of the last payment for additional benefits or for a modification of the amount of benefits on the ground of increase or decrease of incapacity due solely to the injury, or upon grounds of mistake or fraud. The division may, upon the same grounds and within the same time period, apply for modification of medical and disability benefits to a hearing examiner or the medical commission, as appropriate.

(b) Any right to benefits shall be terminated and is no longer under the jurisdiction of this act if a claim for any benefit is not filed with the division within the four (4) year limitation prescribed under subsection (a) of this section.

*See State ex rel. Wyoming Workers' Safety and Compensation Div. v. Henriksen*, 2001 WY 42, ¶ 7, 21 P.3d 1185, 1186–87 (Wyo. 2001); *In re Osenbaugh*, 10 P.3d 544, 549–50 (Wyo.2000); *In re Hernandez*, 8 P.3d 318, 322–23 (Wyo.2000); and *Parnell*, 735 P.2d at 1368–69.

[¶ 40] We affirm.

KITE, Justice, filed a dissenting opinion.

KITE, Justice, dissenting.

[¶ 41] I cannot agree with the majority's resolution of this case. There is no dispute that the fusion resulted from Mr. Phillip's work injury. The only way the hearing examiner could conclude otherwise was to find

---

other things, that he "does not have an ascertainable loss which would qualify for benefits under W.S. § 27–14–405 or 406[.]" 3 Weil's Code of Wyoming Rules, *supra*, at ch. 7, § 2(b)(i)(D), 025 220 001–20.

**22.** According to the Division's rules, a "person seeking an award of benefits under the Act must submit a written application for benefits to the Division, on a form provided by the Division." 3 Weil's Code of Wyoming Rules, *supra*, at ch. 5, § 4, 025 220 001–16. *See also Tenorio v. State ex rel. Wyoming Workers' Compensation Div.*, 931 P.2d 234, 238 (Wyo.1997).

**23.** The appellee did not cross-appeal from the hearing examiner's decision and in its appellate brief, the appellee agreed that the appellant had an "ascertainable loss" by April 1, 2002. The

appellee further stated that "at the very least, Appellant qualified for benefits under Section 405(f)," that Dr. Turner "specifically noted that the injury and resulting [discectomy] resulted in a permanent impairment to the Appellant that would not allow him to return to work in a physically demanding position," and that the appellant had not produced any evidence that he was "not qualified for benefits under that section...."

**24.** As early as February 11, 2002, the appellant indicated in a pleading that "at such time as [the appellant] reached maximum medical improvement," he anticipated "seeking a loss of earning capacity and award pursuant to Wyo. Stat. § 27–14–405 (Lexis 2001) and/or a vocation award pursuant to Wyo. Stat. § 27–14–408 (Lexis 2001)" if appropriate.

that the fusion was unnecessary. Yet that finding does not appear in the hearing examiner's order.

[¶ 42] Moreover, the hearing examiner's findings of fact and conclusions of law are inconsistent in that they state that Mr. Phillips had an ascertainable loss "unless he chose to undergo future surgery." He did choose to undergo future surgery. Therefore, pursuant to the findings of fact, he did not have an ascertainable loss.

[¶ 43] It may be that the videotape recording and some of the testimony convinced the hearing examiner that the surgery was unnecessary. If so, a finding to that effect should appear in the order. As we said in *State ex rel. Dept. of Transportation v. Legarda*, 2003 WY 130, ¶ 10, 77 P.3d 708, ¶ 10 (Wyo.2003), to survive judicial review the record of a contested agency action must contain such factual findings as would permit a court to follow the agency's reasoning from the evidentiary facts on record to its eventual legal conclusions. When an agency does not set forth sufficient findings to permit this Court to follow its reasoning, we cannot uphold its decision. The hearing examiner's findings in Mr. Phillips' case do not support the conclusion that he had an ascertainable loss. For this reason, I would reverse the hearing examiner's determination.