# IN THE SUPREME COURT, STATE OF WYOMING

## 2017 WY 69

**APRIL TERM, A.D. 2017**

**June 13, 2017**

IN THE MATTER OF THE WORKER'S
COMPENSATION CLAIM OF:

LEA V. PORTER,

Appellant
(Petitioner),

v.                                                             S-16-0232

STATE OF WYOMING, ex rel.,
DEPARTMENT OF WORKFORCE
SERVICES, WORKERS'
COMPENSATION DIVISION,

Appellee
(Respondent).

*Appeal from the District Court of Fremont County*
*The Honorable Norman E. Young, Judge*

*Representing Appellant:*
Sky D Phifer, Phifer Law Office, Lander, WY.

*Representing Appellee:*
Peter K. Michael, Wyoming Attorney General; Daniel E. White, Deputy Attorney General; Michael J. Finn, Senior Assistant Attorney General; and Benjamin Fischer, Assistant Attorney General.

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**HILL,** Justice.

[¶1]    In July 2014, Lea Porter, through her employer, submitted an injury report to the Wyoming Workers' Compensation Division (Division) by which she reported an injury to her left knee that occurred while she was performing a task that required her to be in a squatting position.  In August 2014, the Division issued a final determination informing Ms. Porter that the Division would not approve payment of benefits because it had determined her injury was not a work-related injury.  Ms. Porter did not object to that final determination or request a hearing.  Ms. Porter did, however, object to an October 2014 final determination that denied payment of costs related to an MRI of her left knee.

[¶2]    Ms. Porter's objection to the October 2014 denial of benefits was referred to the Office of Administrative Hearings (OAH).  The OAH granted the Division summary judgment, ruling that Ms. Porter could not challenge the denial of benefits for the MRI because she did not object to the Division's August 2014 determination that her injury was not a work-related injury.  The district court affirmed the OAH ruling, and Ms. Porter appealed to this Court.  We reverse and remand.

## ISSUES

[¶3]    Lea Porter presents three issues on appeal, which she states as:

> 1.      Was the Final Determination of August 26, 2014 void as being without observance of law as it was not issued in a timely manner pursuant to statute?
> 2.      Was the Final Determination of August 26, 2014 void as being without observance of law for not following the statute requiring a statement of reasons?
> 3.      Did the Division abuse its discretion in not making a redetermination to award benefits under W.S. § 27-14-601(k)(vi)?

The Division presents essentially the same issues but states them differently:

> I.      Under Wyoming's Workers' Compensation scheme, the Division's final determination is not subject to administrative or judicial review if a claimant does not timely file a written request for a hearing to contest a Final Determination denying her eligibility for benefits. Can Porter obtain judicial review of the Final Determination?
> II.      Wyoming law forbids judicial or administrative review of a claim for workers' compensation if a timely written request for hearing is not filed.  However, the Division may,

1

in its own discretion, make a redetermination within one year of the original determination. Is the Division required to make a redetermination and allow Porter to litigate the merits of her claim, despite her failure to timely file a written request for a hearing?

[¶4]   Given that the parties' dispute, both here and as it was argued to the OAH and district court, centers on the preclusive effect of the August 2014 determination, we find the single dispositive issue may be stated as: Whether Ms. Porter was collaterally estopped from challenging the Division's October 2014 final determination because she failed to timely object to the Division's August 2014 compensability determination.[1]

## FACTS

[¶5]   Lea Porter works as a nutrition specialist at the Wyoming Life Resource Center in Lander, Wyoming. Her duties include meal preparation, serving meals, and clean-up of the dining room after meals. On July 18, 2014, Ms. Porter had only recently returned to full-time work, having been off work or working a reduced schedule while recovering from knee replacement surgery on her right knee. At about 5:30 p.m. that evening, near the end of her shift, Ms. Porter injured her left knee while performing her dining room clean-up duties. She described what happened:

> Q.     It was the evening meal that had been served?
> A.     Yes, sir.
> Q.     And what was this table or thing that you were getting under to drain?
> A.     The entrée station.
> Q.     What's the entrée station look like?
> A.     It's metal. It's wide. It has hot wells where you serve the food.
> Q.     So kind of like where you scoop the food out at a buffet or something like that?
> A.     Yep—yes.

---

[1] This Court is generally reluctant to frame an appellant's issues or arguments because we "run the risk of deciding the appeal on an issue with respect to which the appellee had not been notified and thus had inadequate defense opportunities." *Elworthy v. First Tennessee Bank*, 2017 WY 33, ¶ 3, 391 P.3d 1113, 1115-16 n.1 (Wyo. 2017) (quoting *Montoya v. Navarette-Montoya*, 2005 WY 161, ¶ 4, 125 P.3d 265, 268 (Wyo. 2005)). In this case, however, the question of the preclusive effect of the August 2014 final determination was the basis for the Division's summary judgment motion, and the Division therefore had an opportunity below to develop its argument on the question—and did in fact present a thorough argument on the collateral estoppel question. Because we have a clear understanding of the Division's position on the question, we will address what we see as the controlling question and treat the Division's arguments to the OAH as if they were made to this Court.

Q.      * * * Does hot water or something circulate through this to keep the food warm?

A.      Yes.   We have to open and close a lever underneath of it and fill it with water, and it has temperatures to keep the food at the right temperature.

Q.      So the table is attached to the building's plumbing?

A.      Yes, sir.

Q.      And hot water can be taken in to heat the food in it?

A.      Yes, sir.

Q.      Which fills up wells that need to be drained?

A.      Yes, sir.

Q.      And that's what you were doing?

A.      Yes, sir.

Q.      Okay.  And that's a manual operation.  It does not – you can't push a button somewhere?  You have to physically get under the table?

A.      Yes, sir.

Q.      All right.  The wells were empty, the meal had been completed, and you're just under there draining the water off so that the table is prepared for the next meal?

A.      Yes.

Q.      What did you feel in your left knee?  What did it feel like?

A.      Well, I was just back at work full time, and I had to reach under there.  And because of my surgery, I wasn't able to get on my knees.  I had to turn and twist and lift myself up, and it like felt like a ripping down my leg and my knee area immediately.

Q.      Sort of down the front or the back of your shin?

A.      Down the front of – yeah, on the inside.

Q.      Front on the inside?

A.      Yes.

Q.      Of your shin.  Okay.  Inside being the one that's closest to the other leg, right?

A.      Yes.

Q.      Did you hear or feel any popping or anything like that?

A.      It kind of popped, and it felt like a burning tear.

Q.      Was there pain?

A.      Immediately.

Q.      And that was a burning pain?

3

A.       Uh-huh.

Q.       You have to say yes or no –

A.       Oh, yes.

Q.       * * * Had you ever felt symptoms like that before, tearing, popping, burning pain, any kind of pain in that knee?

A.       Yes, similar to my first injury – that's why I was worried – but different as it went down the inside of my leg.

Q.       So it felt kind of like when your right knee had the problem?

A.       Yes.

Q.       But it went down the inside of your leg, which is different?

A.       Yes.

Q.       The other knee had gone down the outside?

A.       It was all over.

Q.       All over.  Now, did any other symptoms come up as far as swelling, bruising or anything like that?

A.       Swelling, and I could barely walk.

Q.       And that was because of the pain?

A.       Yes, sir.

Q.       And did all of this come on suddenly all at once, or are we talking about –

A.       Suddenly, Immediately.

[¶6]    After her shift ended on July 18, 2014, Ms. Porter reported her knee injury to her supervisor and went home and put ice on her knee.  Ms. Porter did not miss any days of work, and on July 27, 2014, she took her report of injury to human resources.  On July 28, 2014, Ms. Porter, through her employer, submitted a report of injury to the Division.

[¶7]    The human resources officer who assisted Ms. Porter with her injury report asked Ms. Porter if she had seen a doctor.  Ms. Porter responded that she did not have health insurance, and she asked to see Dr. Gilbertson, the on-site physician who treats both residents of the Wyoming Life Resource Center and employees of the Center who are injured at work.  The human resources officer agreed and made an appointment for Ms. Porter to see Dr. Gilbertson on July 28, 2014.  Dr. Gilbertson described the July 28, 2014 consultation as follows:

Q.       So the first time on the left knee that you saw Lea Porter was on July 28th of 2014?

A.       Correct.

Q.       And tell me what she reported to you.

4

A. Well, she reported that she had injured it. She was at work * * * squatted down reaching for something under the table and felt something, felt a sudden discomfort in the medial inside part of her knee.

Q. And what treatment did you give her?

A. Well, I examined her, and the only positive finding – and if I can elucidate a little further – from an exam, we can tell if somebody has an effusion, excess fluid, whether it's blood or clear fluid, joint fluid. We can also test their ligaments for stability and also check for if there's any evidence that they may have injured special cartilages that the knee has called menisci or semilunar cartilages.

And I did all that, and the only thing that I could find was she had joint line tenderness, which just means if you palpate somebody's joint line on their knee, if the cartilages are okay, it doesn't cause pain. And she had specific joint line tenderness, which is kind of what I would call a soft sign that she might have a cartilage tear, which is what I think she had, at least part of her problem, with her right knee before.

And again, there are other knee cartilage things you can do to see if is it likely they have a tear, but I've also – and those were negative. But I've seen over the years numerous people that the only positive finding was joint line tenderness. So I thought, well, especially given that she'd had another knee that, you know, she had a tear in, that it would be indicated to do an MRI on that knee.

And again, as you guys both probably know, routine x-rays don't show us anything except bone, CAT scans can show us to some degree, and not a bad amount, the cartilages and ligaments, but not nearly as accurate as an MRI which uses magnetic fields to get a very clear anatomic picture of those soft tissues.

Q. Okay. And so what all did you recommend for her at that time?

A. Well, I recommended that she take a moderate dose of Ibuprofren, and I also prescribed a pain reliever, tramadol, for her pain and to see me, you know, shortly after she had the MRI.

[¶8]   On August 1, 2014, upon Dr. Gilbertson's referral, Ms. Porter had an MRI of her left knee. Dr. Gilbertson described the results of the MRI:

Q. Did you receive the results of that MRI?

5

A.    Well, I got a verbal report when I had seen her on [August] 8th, but for some reason, we hadn't gotten the typewritten report. And the verbal report was that there wasn't any internal derangement, meaning no acute ligament or cartilage tears, and so my note from the 8th says normal knee.

And so with that verbal report, I just said, "Well, I think you just strained it. Let's do some ice and some home physical therapy," and I renewed her tramadol. And I let her go back to work without any specific restrictions, with the exception that with anything like this, I always tell them, "Do what you can do. If it hurts to do something, don't do it."

Q.    So did you do any examination at that time?

A.    Yeah. And she still had some tenderness, and I put very mild tenderness, in the left knee joint right about here. Okay.

Q.    Here meaning on the inside –

A.    Well, on the medial side just – you know, just in front or just sideways from the patella, from the kneecap.

Q.    And what was your impression at that time?

A    I said, "Well, Lea, I think you just strained some things." And, what the heck do we mean by a strain? I mean that she probably tweaked a little bit some of the – perhaps the ligaments or the fibrous tissue of the capsule of the knee joint that holds the joint fluid in and things, but without any obvious tears to any significant internal structures.

Q.    So did you see her again on her left knee?

A.    I did. I saw her September 5th, and I did not examine her. She told me that her knee was feeling better.

And I now had the paper copy, and I went over with her that there were some degenerative changes, meaning some arthritic changes in her cartilage and some small fluid-filled cysts, which just means again degenerative changes from wear and tear. And I told her that she ought to just be careful with her knee, no specific restrictions, but just be careful going up and down stairs, try to avoid twisting motions and just kind of see how things go.

Q.    So prior to ordering the MRI, did you feel that it was medically necessary to do that?

A.    I did based on the amount of pain and the joint line tenderness that she had.

6

[¶9]    Regarding the strain to Ms. Porter's left knee, Dr. Gilbertson opined:

Q.    * * * In looking at the MRI that has an exam date of 8/1/2014 – are you with me?
A.    Yeah.
Q.    So down at the bottom, it's got a category called effusion
A.    Uh-huh.
Q.    And then it says large joint effusion.  Can you explain that?
A.    Well, again, effusion – well, the knee has several compartments that have fluid in the knee, the main one being the knee joint itself.  And that compartment is kept in place – the fluid is kept in place by a fibrous capsule surrounding the knee joint, and it also extends not the joint capsule, but the same fluid circulates through a bursa above the kneecap here.  And so there's a small amount of fluid in all of our knee joints and in the bursa to lubricate it.  That's what the joint fluid and the bursa fluid do.
So when they did her MRI, they saw that there was more fluid in the joint than normal.  And I must relate back to my note that obviously it didn't impress me that she had very much effusion when I saw her.  I really would have put it in my note.  But there's no question that she had more fluid in and around the joint than is normal, okay, when they did the MRI.
Q.    Okay.
A.    And do you want me to elucidate on that a little more?
Q.    Yes, please.
A.    An effusion in a large joint like the knee means usually infection, inflammation, like rheumatoid arthritis, not with degenerative arthritis, or trauma.  Okay.  Those are the three things that I can think of that would cause an effusion.
Q.    So the strain injury that she had from the squatting and that she described to you –
A.    Right.
Q.    --could that – is it very likely that that is the cause of that?
A.    I believe it's certainly possible, and in my estimation, it's very likely, yes.

[¶10]  On July 28, 2014, the Division received Ms. Porter's injury report.  On August 26, 2014, the Division issued to Ms. Porter a notice entitled "Final Determination Regarding Denial of Benefits."  The August 26th final determination notified Ms. Porter:

> Please be advised that the Workers' Compensation Division has reviewed your injury report and has determined we do not approve payment of benefits.
> • Definition of injury does not include:  Any injury resulting primarily from the natural aging process or from the normal activities of day-to-day living, as established by medical evidence supported by objective findings. (Wyoming Statute § 27-14-102(a)(xi)(G))
> Either the injured worker or the employer may object to this determination and request a hearing.  Affected parties have a right to a hearing before a hearing examiner as provided by the Wyoming Worker's Compensation Act and to legal representation.  The Division must receive a written request for a hearing on or before September 11, 2014.  If a timely written request for hearing is not filed with the Division, the final determination by the Division pursuant to W.S. § 27-14-601(k) shall not be subject to further administrative or judicial review.

[¶11]  Ms. Porter did not object to the August 26, 2014 final determination or request a hearing.  Thereafter, on September 25, 2014, the Division received a bill from Riverton Memorial Hospital for Ms. Porter's August 1, 2014 MRI.  On October 15, 2014, the Division sent a final determination to Riverton Memorial Hospital, with a copy to Ms. Porter, denying payment for the MRI.  The October 15, 2014 final determination cited the same statutory exclusion of injuries resulting from the natural aging process or from normal activities of day-to-day living, and added as an additional ground for denial:  "A claim for services must be reasonably justified and required as a result of the work related injury.  W.S. 27-14-501(a)."  The determination also advised: "If the health care provider or the claimant disagrees with this determination, a hearing may be requested."

[¶12]  Ms. Porter objected to the October 2014 final determination, and the Division referred the matter to the OAH for hearing.  The Division moved for summary judgment, arguing that Ms. Porter's failure to object to the August 2014 final determination precluded her from objecting to the October 2014 final determination.  On June 15, 2015, the OAH entered an order granting the Division's motion for summary judgment.  The OAH reasoned, in part:

> In her Report of Injury Claimant alleged a left knee injury which she said occurred on July 18, 2014 while

working as a nutrition specialist at the Lander Life Resource Center. The Division acted upon this Report of Injury ultimately issuing a Final Determination denying compensability on August 26, 2014. As stated in the Final Determination, if Claimant disagreed with it, she had to respond to it in writing before September 11, 2014. She never did so. Accordingly, pursuant to the clear provisions of W.S. § 27-14-601(k)(iv) [and] (vi) the Final Determination is not subject to further administrative review, except that the Division may, "in its own discretion," make a re-determination of that Final Determination within one year.

Claimant argues that the matter before the Office is the second Final Determination only, being the one which denied payment of the MRI bill. While it is true that the original Final Determination denying compensability is not before the Office for consideration, the legal significance of it and Claimant's failure to act timely upon it is certainly something the Office must consider in making its decision as to the October 15, 2014 Final Determination denying payment of the MRI.

Therefore, the issue to be determined is whether Claimant can overcome this statute of limitations type of provision in asserting a claim for medical benefits arising out of the work event which was the subject of the Report of Injury and initial Final Determination denying compensability? The Office concludes she cannot and that summary judgment should be granted in favor of the Division.

[¶13] The OAH rejected Ms. Porter's arguments concerning the adequacy of the August 2014 final determination, as well as her argument that the Division abused its discretion in failing to make a re-determination of the August 2014 final determination. The OAH further ruled:

Finally, Claimant argues that the disputed medical benefit in any event should be paid because the MRI study was ordered to diagnose or at the very least to rule out that Claimant had experienced a work-related injury or material aggravation of a pre-existing condition. This argument may have had merit if Claimant had timely responded to the initial Final Determination, but she did not. See, e.g., *Snyder v. State ex rel. Wyoming Workers' Compensation Div.*, 957 P.2d 289, 295 (Wyo. 1998). However, for the Office to consider

9

whether or not payment for a "rule out" basis was appropriate the Office would have to ignore the fact that Claimant did not timely respond to the initial Final Determination.

    \* \* \* Because Claimant did not timely respond to the initial Final Determination Regarding Compensability, she cannot now seek a medical benefit alleged to have been necessitated by the event which caused the alleged work injury.

[¶14] Ms. Porter filed a timely petition for review in district court, and on July 28, 2016, the district court issued an order upholding the OAH decision. Ms. Porter thereafter filed a timely notice of appeal to this Court.

## STANDARD OF REVIEW

[¶15] We review a district court's ruling on an administrative appeal as if it had come directly from the administrative agency and give no deference to the district court's decision. *Price v. State ex rel. Wyo. Dep't of Workforce Servs.*, 2017 WY 16, ¶ 7, 388 P.3d 786, 789 (Wyo. 2017). Whether a determination by the Division should be given preclusive effect is a question of law. *State ex rel. Workers' Safety Div. v. Jackson*, 994 P.2d 320, 322 (Wyo. 1999) (reviewing preclusive effect of final determination denying benefits as a question of law). "[W]e review an agency's conclusions of law *de novo*, and will affirm only if the agency's conclusions are in accordance with the law." *Price*, ¶ 7, 388 P.3d at 790 (quoting *Bailey v. State ex rel. Wyo. Dep't of Workforce Servs.*, 2015 WY 20, ¶ 12, 342 P.3d 1210, 1213 (Wyo. 2015)).

## DISCUSSION

### A.    Preclusive Effect of August 2014 Final Determination

[¶16] Collateral estoppel bars relitigation of previously litigated issues and is a principle of law that generally applies to issues adjudicated before an administrative agency. *Matter of Claim of Hood v. State ex rel. Wyo. Dep't of Workforce Servs.*, 2016 WY 104, ¶ 21, 382 P.3d 772, 777 (Wyo. 2016). We have, however, limited its application in the context of workers' compensation benefits. *Hood*, ¶ 22, 382 P.3d at 777 ("[T]he Division's award of uncontested benefits does not establish that future benefits cannot be challenged."); *Osenbaugh v. State ex rel. Wyo. Workers' Safety and Compensation Div.*, 10 P.3d 544, 549 (Wyo. 2000) (quoting *Jackson*, 994 P.2d at 323) ("This Court does 'not give collateral estoppel effect to an uncontested Division determination denying benefits.'"); *Tenorio v. State ex rel. Wyo. Workers' Compensation Div.*, 931 P.2d 234, 240 (Wyo. 1997) (final determination awarding benefits does not estop the Division from denying future benefits). Each of these cases addressed the effect of an uncontested Division determination, and the rule that emerged from the cases may be summarized as:

an uncontested Division determination, either awarding or denying benefits, will not be given preclusive effect with respect to future determinations and objections.

[¶17] The Division acknowledges these prior rulings, but it contends this case is distinguishable because the final determination here was the Division's initial determination of compensability. It argues that the provision governing the initial determination of compensability, Wyo. Stat. Ann. § 27-14-601(a), reflects an intention to treat the compensability determination as finally and fully litigated if a timely objection is not made to that determination. We disagree.

[¶18] We begin with the reasoning underlying our prior holdings. In *Tenorio*, where we held a final determination awarding benefits does not estop the Division from denying, or the employer from objecting to, future benefits, we premised our holding on the legislature's intent concerning finality. We explained:

> [W]e must recognize the legislature's intent to provide a distinct forum for "a final adjudication on the merits." When the legislature provided for a continuing right to notice and hearing with the submission of each claim, it provided a distinct forum for contested cases. In any contested case, "[t]he hearing examiner has exclusive jurisdiction to make the final administrative determination of the validity and amount of compensation payable under [the workers' compensation] act." Wyo.Stat. § 27-14-602(c) (1991). Were we to apply collateral estoppel to the uncontested factual determinations of the Division in future claims for benefits which are contested, we would nullify the legislature's express intent that the hearing examiner be the final arbiter on the merits of a contested case.

*Tenorio*, 931 P.2d at 240.

[¶19] In *Jackson*, we extended the same rule, based on the same reasoning, to final determinations denying benefits. We again explained:

> Although the present case concerns an uncontested denial of benefits and *Tenorio* involved an uncontested award of benefits, the analysis remains the same. In discerning the legislature's intent in this area, the *Tenorio* court acknowledged that the legislature has provided a "distinct forum," the Office of Administrative Hearings, for final adjudications on the merits. 931 P.2d at 240. We also recognized that the legislature intended that the Office of

11

Administrative Hearings, and not the Division, be the final arbiter of contested cases: "Were we to apply collateral estoppel to the uncontested factual determinations of the Division in future claims for benefits which are contested, we would nullify the legislature's express intent that the hearing examiner be the final arbiter on the merits of a contested case." *Id.* Indeed, "[t]he hearing examiner has exclusive jurisdiction to make the final administrative determination of the validity and amount of compensation payable under this act." Wyo. Stat. Ann. § 27–14–602(c) (Lexis 1999).

*Jackson*, 994 P.2d at 323.

[¶20] Against this backdrop, we turn to Wyo. Stat. Ann. § 27-14-601(a), which the Division cites as the distinguishing factor here. Section 601(a) provides:

Upon receipt, the division shall review the initial injury reports to determine if the injury or death resulting from injury is compensable and within the jurisdiction of this act. ***No subsequent claim for compensation under this act shall be approved if the division determines the injury or death is not compensable*** and under the jurisdiction of this act or if the employer states on his injury report that the injury is not compensable, until a determination is rendered by the division. The division shall provide notice of its determination to the employee, employer and the claimant.

Wyo. Stat. Ann. § 27-14-601(a) (LexisNexis 2015) (emphasis added).

[¶21] We are not persuaded that § 27-14-601(a) gives the Division's initial compensability determination a preclusive effect that is absent from other uncontested determinations. Although the highlighted language suggests a conclusiveness in the Division's compensability determination, the fact remains that the determination is one made by the Division. The crux of our holdings in *Tenorio* and *Jackson* was our conclusion that the legislature did not intend Division determinations to carry the preclusive weight that OAH decisions carry. We are able to find no distinguishing language in section 601(a) that persuades us to treat compensability determinations differently.

[¶22] First, a compensability determination made under section 601(a) is subject to the same statutory requirements that informed our decisions in *Tenorio* and *Jackson*. Wyo. Stat. Ann. § 27-14-601(k) directs that "[d]eterminations by the division pursuant to this section * * * shall be in accordance with the following," and what follows are, among

other requirements, the requirement that the determination provide notice of the right to a hearing and the requirement that the Division, upon receipt of a hearing request, immediately notify the appropriate hearing body. Wyo. Stat. Ann. § 27-14-601(k)(iii), (v) (LexisNexis 2015). That appropriate hearing body "has exclusive jurisdiction to make the final administrative determination of the validity and amount of compensation payable" under the Worker's Compensation Act. Wyo. Stat. Ann.§ 27-14-602(c) (OAH); § 27-14-616(b)(iv) (Medical Commission) (LexisNexis 2015).

[¶23] Additionally, there is no provision in Section 601(a) or 601(k) that alters the information that must be included in a Division determination that issues after an uncontested determination denying compensability. In other words, even a final determination that issues after an uncontested determination denying compensability must, like all other determinations, provide notice of the employee's right to a hearing. Thus, again, the same statutory requirements we found indicative of the legislature's intent in *Tenorio* and *Jackson* apply equally to determinations issued after an uncontested determination denying compensability.[2]

[¶24] Reading section 601(a) in light of our reasoning in *Tenorio* and *Jackson*, we see no reason to treat compensability determinations differently from other Division determinations under Wyo. Stat. Ann. § 27-14-601. We thus conclude that our holdings in *Tenorio* and *Jackson*, that the legislature intended a determination to be deemed fully and finally adjudicated only after the determination is contested and ruled on by the appropriate administrative hearing body, apply with equal force to the Division's initial compensability determination.

[¶25] This result is not novel. Our ruling in *Jackson* in fact addressed an uncontested Division determination that an injury was not compensable, and we rejected the Division's argument that any preclusive effect should attach to that determination. In *Jackson*, the employee suffered an injury to her left ankle that the Division determined was a compensable work injury. *Jackson*, 994 P.2d at 321. Subsequently, the employee developed degenerative conditions in her right hip and knee, which her treating physician related to the left ankle injury. *Id.* at 321-22. The employee's physician submitted a bill for treatment of the right hip and knee, and the Division issued a final determination denying benefits based on its finding:

> The hips and knees have not been established as part of the original workers' compensation left ankle injury. This denial is based upon the Division's authority to review all medical records pursuant to Wyoming Statute 27–14–401(b).

---

[2] This is in fact what happened in this case. The Division issued the August 2014 final determination denying compensability, to which Ms. Porter did not object. Even though that first compensability determination went uncontested, the Division, in accordance with section 601's requirements, included in its October 2014 final determination notice of Ms. Porter's right to a hearing.

*Jackson*, 994 P.2d at 321.

[¶26] Neither the employee nor the employee's physician submitted a timely objection to the Division's determination that the employee did not suffer a compensable work injury to her right hip and knee. *Jackson*, 994 P.2d at 321. Subsequently, the employee submitted a claim for temporary total disability (TTD) benefits related to her hip and knee conditions, and that claim was again denied. *Id.* at 322. This time the employee timely objected, and the matter was referred to the OAH. *Id.* Before the OAH, the Division argued that the employee's failure to timely object to the earlier final determination "precluded her from establishing that her hip and knee ailments are compensable." *Id.* The OAH rejected the argument, and we affirmed, concluding as indicated above, that "[j]ust as we will not give collateral estoppel effect to an uncontested award of benefits by the Division, we will not give collateral estoppel effect to an uncontested Division determination denying benefits." *Id.* at 322, 323.

[¶27] Our precedent is thus clear. Whether an uncontested determination by the Division concerns a specific bill or type of benefit or the fundamental question of compensability, that determination does not have a preclusive effect on an injured employee's right to contest future Division determinations.

[¶28] This limitation on the preclusive effect of the Division's determination is not only in keeping with the legislature's intent, but also makes sense in light of the purpose served by the principle of collateral estoppel. We have said:

> The principle of collateral estoppel bars relitigation of previously litigated issues, and is based on the common-law principle that "a right, question or fact put in issue, and directly determined by a court of competent jurisdiction, cannot be disputed in a subsequent suit by the same parties or their privies."

*Hood*, ¶ 21, 382 P.3d at 777 (quoting *Tenorio*, 931 P.2d at 238).

[¶29] Aside from our conclusion that the legislature expressed a clear intention to make the OAH or Medical Commission the "court of competent jurisdiction" for these determinations, it is difficult to find in the Division's August 2014 final determination a litigation of the compensability question. Because the August 2014 final determination cited a statutory provision that contained two different grounds for denying a claim, it is impossible to glean what actual findings the Division made. We cannot discern whether the Division considered Ms. Porter's squatting to reach under the entrée table to be a normal activity of day-to-day living, or whether it found that her left knee strain and effusion was an injury resulting from the natural aging process, or some other

14

combination of these considerations. The August 2014 determination simply bears no indicia of an actual adjudication and provides no basis to implicate the principle of collateral estoppel.

[¶30] Finally, we also observe that whichever statutory basis informed the Division's compensability determination, that determination had limited bearing in itself on the question of whether Ms. Porter should be awarded the costs related to her MRI. We have held that "[a]n appropriate diagnostic measure is not non-compensable merely because it fails to reveal an injury which is causally connected to an on-the-job injury." *Mitcheson v. State ex rel. Wyo. Workers' Safety & Compensation Div.*, 2012 WY 74, ¶ 22, 277 P.3d 725, 734 (Wyo. 2012) (quoting *Snyder v. State ex rel. Wyo. Worker's Comp. Div.*, 957 P.2d 289, 295 (Wyo. 1998)). The determination of whether Ms. Porter's MRI is compensable as diagnostic testing depends not on the Division's compensability determination but on whether the evidence shows an "objective indication of a physiologic connection between the claimant's injury and the diagnostic measure." *Mitcheson*, ¶ 23, 277 P.3d at 734-35.

## B.   Directions on Remand

[¶31] Ms. Porter testified that she missed no work as a result of the injury to her left knee and that the only workers' compensation benefit she is seeking is an award to cover the costs related to her MRI. As we noted above, whether Ms. Porter's MRI is compensable as diagnostic testing depends on whether the evidence shows an "objective indication of a physiologic connection between the claimant's injury and the diagnostic measure." *Mitcheson*, ¶ 23, 277 P.3d at 734-35. Against this standard, we remand to the OAH for a determination of whether Ms. Porter is entitled to benefits to cover the costs related to her MRI.

## C.   Remaining Issues

[¶32] Because we have found that the August 2014 final determination did not preclude Ms. Porter's objection to the October 2014 Final Determination, we need not address Ms. Porter's claims concerning the adequacy and timeliness of the August 2014 final determination. For the same reason, we also need not address the question of whether the Division abused its discretion in failing to make a redetermination of compensability.

## CONCLUSION

[¶33] We do not give collateral estoppel effect to an uncontested Division determination denying workers' compensation benefits even when the denial is based on a finding that the employee did not suffer a compensable injury. Lea Porter's failure to object to the Division's August 2014 final determination therefore did not preclude her objection to the Division's October 2014 final determination denying benefits to cover her MRI costs.

15

We therefore reverse and remand to the OAH for a determination of whether Ms. Porter is entitled to benefits to cover her MRI costs.