# IN THE SUPREME COURT, STATE OF WYOMING

# 2022 WY 123

APRIL TERM, A.D. 2022

September 29, 2022

ROBERT GENNER,

Appellant
(Petitioner),

v.

STATE OF WYOMING, ex rel.
DEPARTMENT OF WORKFORCE
SERVICES, WORKERS'
COMPENSATION DIVISION,

Appellee
(Respondent).

S-22-0012

*Appeal from the District Court of Fremont County*
The Honorable Jason M. Conder, Judge

*Representing Appellant:*
Benjamin J. Sherman, Olsen Legal Group, LLC, Cheyenne, Wyoming.

*Representing Appellee:*
Bridget Hill, Wyoming Attorney General; Mark Klaassen, Deputy Attorney General; Peter F. Howard, Senior Assistant Attorney General; Holli J. Welch, Senior Assistant Attorney General.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.

**KAUTZ, Justice.**

[¶1]     The Wyoming Workers' Compensation Division (Division) denied Robert Genner's request for permanent total disability (PTD) benefits for a 2002 work-related back injury which, he claimed, made him unemployable.  The Medical Commission Hearing Panel (Medical Commission) upheld the Division's denial, concluding Mr. Genner did not prove the workplace injury caused his inability to work.  The district court found substantial evidence in the record to support the Medical Commission's decision.  We affirm.

## ISSUE

[¶2]     We restate the dispositive issue in this case as:  Was the Medical Commission's denial of Mr. Genner's PTD claim supported by substantial evidence and in accordance with the law?

## FACTS

[¶3]     Mr. Genner moved to Dubois in the mid-1980s.  In 2002, he was working in Jackson as a heating, ventilation, and air conditioning (HVAC) technician for Delcon, Inc. when he injured his back lifting a container of glycol into a truck.  The emergency room physician who evaluated Mr. Genner the day after the accident diagnosed a lumbar strain.  A follow-up MRI showed Mr. Genner had narrowing of the disc space at the L4-L5 vertebral level (where he had previously undergone a laminectomy and fusion) and at the L2-L3 vertebral level.  The Division approved worker's compensation coverage for the 2002 back injury, and he was treated with three steroid injections.

[¶4]     A year later, Geoffrey Skene, D.O., determined Mr. Genner's workplace injury resulted in a 5% permanent partial impairment (PPI) of his whole body.  The Division accepted the rating and awarded him PPI benefits.  *See* Wyo. Stat. Ann. § 27-14-102(a)(ii) (LexisNexis 2021) (an employee suffers a PPI when a workplace injury leaves him with a physical impairment and his condition "will not substantially improve or deteriorate"); Wyo. Stat. Ann. § 27-14-405(f) (LexisNexis 2021) (authorizing payment of PPI benefits). Mr. Genner then applied for permanent partial disability (PPD) benefits to compensate him for his loss of earning capacity from the PPI.  *See* § 27-14-102(a)(xv) (PPD means the "economic loss to an injured employee" from a PPI); § 27-14-405(h) (authorizing payment of PPD benefits).  In his PPD application, Mr. Genner stated that, because of the workplace injury, Dr. Skene had restricted him to lifting a maximum of 20 pounds.

[¶5]     Due to the lifting restriction, Mr. Genner was unable to continue working for Delcon.  He was employed briefly at a hardware store in Jackson and as a maintenance worker for Jackson Hole Aviation.  In 2004, he began work as a firefighter and airport technician for the Jackson Hole Airport Authority.  To keep his job, he was required to

1

pass a vigorous physical fitness test each year. He retired from the airport in 2014 at the age of 72 and did not work thereafter.

[¶6] The record does not show Mr. Genner received any medical treatment for his back injury from 2004 until 2008. From 2008 through 2010, Mr. Genner was treated for "severe on and off" low back pain with prescription anti-inflammatories, a muscle relaxant, and, on occasion, opioids. An MRI performed in 2013 showed significant degenerative disc disease in Mr. Genner's lumbar spine. Orthopedic surgeon, Joshua Beck, M.D., stated in records from that time that Mr. Genner's low back pain was "related" to his 2002 worker's compensation injury and recommended surgery to decompress and fuse "L2 to L5." Michael Kaplan, M.D., reviewed Mr. Genner's medical records at the Division's request and confirmed the surgery was "appropriate," but Dr. Kaplan could not say whether it was "directly related" to the 2002 work injury. The Division, nevertheless, covered the 2014 surgery.

[¶7] Mr. Genner continued to experience back pain and had a decompression and spinal fusion at the L1-L2 vertebral level in 2016 which, again, was covered by the Division. After that surgery, Mr. Genner's condition improved for a few months. He reported to his physician that he was having "minimal to no back pain" and was not taking pain medication. However, his back pain returned later in the year after he went hunting. In 2017, with the Division's approval, Mr. Genner had a dorsal spinal cord stimulator implanted in his back to relieve pain.

[¶8] Mr. Genner's treating pain physician, Jed Shay, M.D., provided an updated PPI rating in 2017. Dr. Shay reported Mr. Genner suffered from "chronic pain syndrome post lumbar stenosis at multiple levels with fusion from L1-S1 with neurogenic claudication [pain caused by a decrease in blood flow]" and calculated a 17% whole body permanent impairment. The Division approved Dr. Shay's 17% impairment rating in July 2017 and awarded Mr. Genner additional PPI and PPD benefits.

[¶9] A few months after receiving the PPI and PPD awards, Mr. Genner applied for PTD benefits, claiming he was unable to work because he was in chronic pain, could not "lift, bend, twist . . . [or] reach," and was taking opioid medication. Despite his advanced age, Mr. Genner maintained he retired in 2014 only because, as a result of the workplace injury, he could no longer physically perform his duties. Dr. Shay provided a disability certification in support of Mr. Genner's PTD application.

[¶10] The Division denied Mr. Genner's application for PTD benefits. He objected to the determination, and the Division referred the matter to the Medical Commission for a contested case hearing. Mr. Genner asserted at the hearing that he was entitled to PTD benefits under the "odd lot" doctrine, which applies to injured workers who are not "'altogether incapacitated for work [but are] so handicapped they will not be employed regularly in any well[-]known branch of the labor market.'" *In re Pickens*, 2006 WY 54,

2

¶ 13, 134 P.3d 1231, 1235 (Wyo. 2006) (quoting *Schepanovich v. U.S. Steel Corp.,* 669 P.2d 522, 525 (Wyo. 1983)) (other citations omitted). Mr. Genner was the only witness to testify at the hearing, but the Medical Commission considered deposition testimony from Dr. Shay and Margot Burns, a vocational expert who evaluated Mr. Genner in 2019 to determine his employability. It also considered the exhibits offered by Mr. Genner, including various medical records and reports, worker's compensation documents, and Ms. Burns' vocational evaluation.

[¶11] The Medical Commission upheld the Division's denial of PTD benefits to Mr. Genner. It generally concluded Mr. Genner had not presented a prima facie case for PTD benefits under the odd lot doctrine because he did not show: 1) his 2002 workplace injury caused his inability to work; or 2) a lack of suitable work in his community. Mr. Genner petitioned the district court for review of the Medical Commission's decision, and that court affirmed. He filed a timely notice of appeal.

## DISCUSSION

[¶12] Mr. Genner claims the Medical Commission incorrectly determined he did not meet his burden of proving he was entitled to PTD benefits under the odd lot doctrine. We examine the case as if it came directly from the Medical Commission and give no deference to the district court's decision affirming the agency decision. *Morris v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.,* 2017 WY 119, ¶ 23, 403 P.3d 980, 986 (Wyo. 2017) (when an appeal is taken from a district court's decision on a petition for review of an administrative action, we examine the case as if it came directly from the agency (citing *Guerrero v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.,* 2015 WY 88, ¶ 11, 352 P.3d 262, 265 (Wyo. 2015), and *Dale v. S & S Builders, LLC,* 2008 WY 84, ¶ 8, 188 P.3d 554, 557 (Wyo. 2008))).

[¶13] Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2021) governs judicial review of administrative agency decisions:

> (c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
>
> (i) Compel agency action unlawfully withheld or unreasonably delayed; and
>
> (ii) Hold unlawful and set agency action, findings and conclusions found to be:

3

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

In accordance with § 16-3-114(c)(ii), we review the agency's findings of fact by applying the substantial evidence standard. *Dale,* ¶ 21, 188 P.3d at 561 (the only evidentiary standard of review in § 16-3-114(c)(ii) is the substantial evidence standard). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Guerrero,* ¶ 12, 352 P.3d at 266 (quoting *Bush v. State ex rel. Wyo. Workers' Comp. Div.,* 2005 WY 120, ¶ 5, 120 P.3d 176, 179 (Wyo. 2005)).

[¶14] The claimant has the burden of proving all the essential elements of his worker's compensation claim by a preponderance of the evidence. *Phillips v. TIC-The Indus. Co. of Wyo., Inc.,* 2005 WY 40, ¶ 25, 109 P.3d 520, 531 (Wyo. 2005).

> If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it.

*Dale,* ¶ 22, 188 P.3d at 561 (citations omitted). "We review an agency's conclusions of law *de novo*[] and will affirm only if the agency's conclusions are in accordance with the law." *Middlemass v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2011 WY 118, ¶ 13, 259 P.3d 1161, 1164 (Wyo. 2011) (citations and quotation marks omitted).

[¶15]   "Permanent total disability" is defined in the Wyoming Worker's Compensation Act as "the loss of use of the body as a whole or any permanent injury certified under W.S. 27-14-406, which permanently incapacitates the employee from performing work at any gainful occupation for which he is reasonably suited by experience or training[.]"  Section 27-14-102(a)(xvi).  Wyo. Stat. Ann. § 27-14-406(a) (LexisNexis 2021) authorizes payment of PTD benefits after "certification by a physician" that the workplace injury caused the claimant's PTD.

[¶16]   A claimant may qualify for PTD benefits under the odd lot doctrine.  *Hart v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.*, 2018 WY 105, ¶ 21, 442 P.3d 653, 660 (Wyo. 2018).  *See also, Ross v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.,* 2022 WY 11, ¶ 20, 503 P.3d 23, 30 (Wyo. 2022) (the "statutory definition of permanent total disability is consistent with the odd lot doctrine" (citing *Schepanovich,* 669 P.2d at 525)).  The odd lot doctrine allows PTD benefits for a claimant, who, although not entirely incapacitated, is de facto unemployable due to his disability and other factors. *Hart,* ¶ 21, 442 P.3d at 660 (citing *Pickens*, ¶ 14, 134 P.3d at 1236).  The claimant "must demonstrate that []he is incapacitated 'from performing any work at any gainful occupation for which []he is reasonably suited by experience and training.'"  *Ross,* ¶ 20, 503 P.3d at 30 (quoting *Schepanovich,* 669 P.2d at 528) (other citations omitted).  To qualify for PTD benefits under the odd lot doctrine,

> a claimant must make a *prima facie* showing that "(1) he is no longer capable of working at the job in which he was employed at the time of his injury, and (2) the degree of obvious physical impairment, coupled with other facts, such as mental capacity, education, training, or age qualify him for odd lot treatment."

*Hart*, ¶ 21, 442 P.3d at 660 (quoting *Pickens,* ¶ 14, 134 P.3d at 1236) (other citations and quotation marks omitted).  After the claimant makes his *prima facie* case, "the burden shifts to the Division 'to show that light work of a special nature which the claimant could perform is available.'"  *Id.*  The question of whether the claimant has presented evidence to establish a *prima facie* case for PTD benefits under the odd lot doctrine "'is a factual one for the agency to determine.'"  *Stallman v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2013 WY 28, ¶ 27, 297 P.3d 82, 89 (Wyo. 2013) (quoting *Moss v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2010 WY 66, ¶¶ 9-11, 232 P.3d 1, 4 (Wyo. 2010)) (other citations omitted).

[¶17]   As part of the first factor in his *prima facie* case, "the claimant must demonstrate a causal connection between a compensable workplace injury and [his] inability to work at the job he held at the time of the injury."  *Hart,* ¶ 21, 442 P.3d at 660 (citing *Pickens,* ¶ 30, 134 P.3d at 1240-41).  The claimant's workplace injury, rather than unrelated injuries or medical conditions, must have "caused the claimant's inability to work."  *Pickens,* ¶ 16,

5

134 P.3d at 1237. "Whether a causal connection exists is a question of fact." *In re Lysne,* 2018 WY 107, ¶ 30, 426 P.3d 290, 298 (Wyo. 2018).

[¶18] The Medical Commission concluded Mr. Genner had not carried his burden of proving his 2002 injury caused his inability to work. Noting Mr. Genner was 77 years old at the time of the hearing, the Medical Commission stated he "must provide the [Medical Commission] with some evidence that his 2002 workplace injury has caused or contributed to his inability to return to work (rather than the effects of aging and the strenuous jobs [Mr.] Genner worked from 2003 until 2014)." The Medical Commission determined expert medical evidence was necessary to establish causation, and Mr. Genner failed to provide such evidence through Dr. Shay's testimony. The Medical Commission's decision stated:

> 57. Dr. Shay's deposition testimony does not link the 2002 injury to [Mr.] Genner's subsequent surgeries in 2014-2016. Dr. Shay testified only that [Mr.] Genner "reinjured his back" in 2002 and "subsequently underwent . . . four additional back surgeries." This is not medical testimony on causation, especially given [Mr.] Genner's preexisting spinal injury. . . .
>
> 58. [Mr.] Genner noted at the . . . hearing that the Division paid for his spinal treatment from 2013 through 2018. This is not proof of causation. The [Medical Commission] has not identified anywhere that the Division stipulated to causation, and "an uncontested Division determination, either awarding or denying benefits, will not be given preclusive effect with respect to future determinations and objections." *Porter [v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.,* 2017 WY 69,] ¶ 16, 396 P.3d [999,] 1005 [(Wyo. 2017)]. . . .
>
> 59. This does not mean the [Medical Commission] does not believe that [Mr.] Genner suffers from lower back pain. Rather, the [Medical Commission] lacks evidence that [Mr.] Genner's current spinal pain and spinal degeneration is caused, in any way, by his 2002 injury. [Mr.] Genner's pain [and] spinal deterioration could result from his advanced age and the seventeen years of life that followed his 2002 injury. . . .
>
> 60. . . . In 2002, [Mr.] Genner was sixty-one years old, and he had a history of spinal fragility. Despite this, Dr. Shay's report indicates that [Mr.] Genner was, at the end of 2003, pain-free. [Mr.] Genner was, however, under a restriction that he [could] not lift more than twenty pounds in order to avoid further irritation to his fragile spine. Indeed, this

6

restriction appears to have been part of the basis for [Mr.] Genner's 5% permanent impairment in 200[3]. [Mr.] Genner did not follow this restriction. Instead, he worked a strenuous physical job for "more money." At Jackson Hole Airport, [Mr.] Genner worked as a firefighter and as an airport operations officer for ten years, where the certification for his position required him to lift weight that greatly exceeded his medical limits.

[¶19] Expert medical evidence is typically required for a claimant to meet his obligation of proving causation unless the injury or condition is "'immediately and directly or naturally and probably' the result of the workplace incident." *Guerrero,* ¶ 25, 352 P.3d at 270 (quoting *Thornberg v. State ex rel. Wyo. Workers' Comp. Div*., 913 P.2d 863, 867 (Wyo. 1996)) (other citations and quotation marks omitted). "We have required medical evidence to establish causation when a significant amount of time elapses between the initial workplace injury and the claim, when there is an intervening injury, when there is a preexisting condition, or when the claimant's symptoms and medical history are complex." *Lysne,* ¶ 18, 426 P.3d at 296. Given many of these circumstances apply to Mr. Genner, the Medical Commission correctly required him to present expert medical evidence on causation.

[¶20] Even though Mr. Genner apparently does not dispute the Medical Commission's finding that Dr. Shay did not testify directly about the causation issue, he claims Dr. Shay's report accompanying the 2017 impairment rating demonstrates the requisite causal link. Dr. Shay recounted Mr. Genner's lower back treatment after the 2002 workplace injury, and Mr. Genner asserts those records establish he was "forced to retire due to the progression of his injury."

[¶21] The agency record contains substantial evidence supporting the Medical Commission's conclusion that Mr. Genner did not prove a causal link between his 2002 workplace injury and his inability to work. As the Medical Commission correctly observed, Mr. Genner's ongoing back issues could have been caused by a variety of factors, including his pre-existing back condition, his strenuous post-injury work in disregard of the 20-pound lifting restriction, and/or the natural aging process. The evidence showed Mr. Genner had a significant preexisting back condition which required surgery in 1997. By comparison, the 2002 injury was a minor lumbar strain, requiring only three steroid injections before his pain resolved, and he was "back at work light duty without back complaints" within three months. Furthermore, there is no specific evidence he received medical treatment for his back injury from 2004 until 2008. Although Dr. Shay's report stated vaguely that Mr. Genner underwent physical therapy on his lumbar spine from 2002 through 2017, no other details were provided.

7

[¶22] As the Medical Commission noted, the evidence of Mr. Genner's strenuous post-injury work activities is compelling proof the 2002 injury did not cause his inability to work. He described the annual recertification test he was required to pass when working as a firefighter for the Jackson Hole Airport from 2004-2014.

> Q. I want to make sure I understand exactly what people had to do to pass that test.
> A. . . . It was a seven-minute test. . . . We had to completely suit up in complete fire gear of our helmet, coat, pants, boots, and an air pack. . . . We would leave the floor of our firehouse . . . [and go] down a flight of steps that was approximately one story . . . into the basement. . . . They had an iron beam that we had to drive approximately 10 feet with a big rubber maul-type hammer. . . . Leave that, go out the back entrance of the basement[] -- up to the top of the stairs, around onto the tarmac of the airport, back in the firehouse, back down the stairs, make two trips with that.
> Let me back up . . . . After we drove the beam, we had to pick up a 50-foot section of 2-and-a-half-inch firehose and throw it over our shoulder. . . . Then after we made the two laps, we would go back up onto the tarmac. We had a fire hydrant in the corner of the firehouse. We would advance an engine three-quarters-inch hand line a hundred feet, . . . open the nozzle, show the water, set the nozzle down, proceed another 50 feet, pick up the 165-pound . . . Rescue Randy Mannequin and . . . carry [it], drag [it], whatever way we could – back to the starting line where we started with the engine three-quarters-inch hand line.

Mr. Genner explained the rubber hammer he used to move the iron beam weighed 10 pounds, the firefighting gear weighed 35 pounds, and the 50-foot section of firehose he carried while running the two laps weighed 45-50 pounds. Mr. Genner told Ms. Burns, the vocational evaluator who testified on his behalf, that the firefighter job "'broke [him] down' but he kept working because he had to earn an income to support his family and he did not have comparable opportunities for employment in Dubois."

[¶23] Mr. Genner claims the Medical Commission's causation finding was not supported by substantial evidence because it disregarded Dr. Beck's 2013 note, which stated Mr. Genner's back condition was "related to a worker's compensation injury from 2002." The Medical Commission addressed the note, stating it did not "find this entry reflects an expert opinion on causation. No additional supporting

8

analysis appears, and the statement can just as easily be read as a summary of [Mr.] Genner's statements to Dr. Beck."

[¶24] As we explained above, if "in the course of its decision[-]making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record," the decision is sustainable under the substantial evidence test. *Dale*, ¶ 22, 188 P.3d at 561. The Medical Commission's decision to disregard this single unexplained medical note was reasonable. The hearing evidence described above did not show the condition that led to Mr. Genner's retirement in 2014 or his inability to work when he applied for PTD benefits in 2018 was caused by his 2002 workplace injury. Furthermore, as the Medical Commission correctly recognized, the Division was not collaterally estopped from denying his PTD claim by its undisputed prior approvals of Mr. Genner's medical treatment and disability claims. *See Porter,* ¶ 16, 396 P.3d at 1005 ("an uncontested Division determination, either awarding or denying benefits, will not be given preclusive effect with respect to future determinations and objections"). *See also, Ross*, ¶ 6 n.1, 503 P.3d at 27 n.1 ("We note that the Division is not estopped from denying benefits for an injury that it previously covered.") (citations omitted).

[¶25] Because Mr. Genner did not satisfy his burden of establishing the first factor of the odd lot doctrine, we need not address the second factor. *See, e.g., Ross,* ¶ 23, 503 P.3d at 31 ("Having found that [the claimant] did not meet the first odd lot prong, we do not address the second prong."); *Pickens,* ¶ 32, 134 P.3d at 1241 ("Because the claimant failed to meet his initial burden of proving that his work-related injury disabled him from continuing in his previous employment, his claim for benefits under the odd lot doctrine was properly denied by the Commission.").

## CONCLUSION

[¶26] The Medical Commission's decision that Mr. Genner did not prove the 2002 workplace injury caused his disability was supported by substantial evidence. He was not entitled to PTD benefits under the odd lot doctrine.

[¶27] Affirmed.

9