2017 WY 119

**In the Matter of The Worker's Compensation Claim of:**

Sarah MORRIS, Appellant (Petitioner),

v.

**STATE of Wyoming, EX REL., DEPART-MENT OF WORKFORCE SERVICES, WORKERS' COMPENSATION DIVI-SION, Appellee (Respondent).**

S-17-0005

Supreme Court of Wyoming.

October 5, 2017

Representing Appellant: Stephenson D. Emery of Williams, Porter, Day & Neville, P.C., Casper, Wyoming.

Representing Appellee: Peter K. Michael, Wyoming Attorney General; Daniel E. White, Deputy Attorney General; Michael J. Finn, Senior Assistant Attorney General.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

KAUTZ, Justice.

[¶1] The Medical Commission (Commission) sustained the Wyoming Workers' Compensation Division's (Division) termination of Sarah Morris's temporary total disability (TTD) benefits after determining she had reached maximum medical improvement (MMI). The Commission also upheld the Division's denial of benefits for treatment of her right knee on the basis that it was unrelated to her work injury. After the district court affirmed the Commission's decision in all respects, Ms. Morris appealed to this Court. We conclude the Commission's determinations are supported by substantial evidence in the record and are not contrary to the law; consequently, we affirm.

## ISSUES

[¶2] Ms. Morris presents the following issues for our review:

A. Whether the Medical Commission appropriately determined [Ms.] Morris had reached MMI and terminated her TTD benefits.

B. Whether substantial evidence exists to support the Medical Commission's decision that [Ms.] Morris's injury to her right knee was not work-related.

The Division offers a similar, though more detailed, statement of the issues for our review.

## FACTS

[¶3] Ms. Morris is trained as a licensed practical nurse (LPN). She worked as a residential manager for I Reach 2 Lifestyles, an organization that provided services to disabled persons in Casper, Wyoming. On February 3, 2011, Ms. Morris's supervisor instructed her to move a heavy love seat out of a house and into a garage. She attempted to move the love seat without assistance and injured her neck and lower back.

[¶4] Although Ms. Morris continued to work, she was in pain and, on February 15, 2011, she sought treatment at an urgent care facility. A nurse practitioner ordered X-rays of her cervical and lumbar spine, which revealed no acute abnormalities. She began physical therapy and took medication for pain and inflammation.

[¶5] In April 2011, Ms. Morris was referred to neurosurgeon Thomas Kopitnik, M.D., and a Physician Assistant (PA) ordered an MRI of her spine and a bilateral nerve conduction study of her upper extremities. On April 22, 2011, Dr. Kopitnik reviewed the MRI results, which showed an annular tear in her lumbar spine at L4-L5 and disc ruptures in her cervical spine at C4-C5 and C5-C6. The nerve conduction study was, however, normal. Dr. Kopitnik recommended surgery on Ms. Morris's cervical spine and conservative treatment for her lumbar spine with an epidural steroid injection. Ms. Morris

worked until July 13, 2011, and the next day, July 14, 2011, she underwent an anterior cervical discectomy and fusion of C4-C5 and C5-C6. Dr. Kopitnik certified her as unable to work, and the Division approved payment of TTD benefits.

[¶6] Ms. Morris saw Dr. Kopitnik on September 19, 2011, complaining of continuing neck pain and "severe low back pain." After reviewing the results of a lumbar discogram, Dr. Kopitnik determined that conservative treatment of her lumbar spine had failed and recommended she undergo lower back fusion surgery. On January 3, 2012, Dr. Kopitnik performed a transforaminal lumbar interbody fusion at L4-L5 and L5-S1 with placement of hardware. Dr. Kopitnik continued to certify Ms. Morris for TTD benefits. On January 19, 2012, Ms. Morris complained of continuing low back pain and, also of left leg pain. X-rays "demonstrated excellent position of the construct" without "any hardware complications," and a myelogram showed "a nice decompression and no obvious compression of her nerve roots in her lower lumbar spine."

[¶7] After that, Ms. Morris's condition improved for a time. The note from her April 2, 2012, appointment stated:

She has been doing relatively well since her last appointment. She has been doing well regarding her back. She has beg[u]n to experience some neck spasms in the posterior aspect of the cervical spine. She does note that she has been increasing her activity and going to the gym more.

X-rays of the lumbar spine at that point showed "good position and alignment of hardware with fusion occurring."

[¶8] At her May 14, 2012, appointment, Ms. Morris reported that she continued to have some low back pain, but did not mention leg pain. Her examination was "normal," and Dr. Kopitnik planned to start weaning her from the back brace and pain medication. Dr. Kopitnik's note from Ms. Morris's July 2, 2012, appointment stated that he had "given her temporary disability for an additional six weeks. Otherwise, [he] liberalized her activity. She has felt better since discontinuing her brace. She is continuing with physical therapy."

[¶9] On September 10, 2012, Ms. Morris apparently reported a change to Dr. Kopitnik's PA. The "Subjective" portion of the appointment notes stated that she was struggling with low back pain which had initially subsided but now had worsened. The "Objective" section stated that her strength remained 5/5 throughout, cervical range of motion was good, her lumbar range of motion was good "with some mild pain with lumbar extension." The notes also stated that she was able to stand on her toes and heels without difficulty, her gait was normal, and the "sensory exam" was "within normal limits to light touch throughout." The PA concluded that she was clinically stable, although she had some continuing low back pain. He ordered an S1 joint injection on the left side to "see if she gets some decent relief." The PA thought "some more time and allowing this fusion to mature" would hopefully provide some better relief.

[¶10] Less than a month later, Ms. Morris returned to the clinic. This time she complained of neck, lumbar and thoracic spine pain, but her examination was normal. Dr. Kopitnik ordered a total spine myelogram which showed solid fusions in her cervical and lumbar spine, with "no obvious disc ruptures and no obvious nerve root compression in her cervical, thoracic or lumbar spine." Dr. Kopitnik diagnosed her as suffering from "post laminectomy and post fusion syndrome with continued low back pain" and referred her to Dr. Todd Hammond, a pain management specialist, for a spinal cord stimulator trial to see if it would help with her pain. According to Dr. Hammond, a spinal cord stimulator is a mechanical device with an electrical lead that is placed along the spinal cord. The electrical impulse inhibits the amount of pain signal that reaches the brain. In other words, it tricks the nervous system into not recognizing the pain. Throughout this time, Dr. Kopitnik continued to certify Ms. Morris as temporarily totally disabled.

[¶11] The Division referred Ms. Morris to Dr. Paul Ruttle for an orthopedic medical evaluation and permanent partial impairment (PPI) rating. Dr. Ruttle reviewed Ms. Morris's medical records and examined her on

October 25, 2012. He stated in his report Ms. Morris informed him that, although her cervical and low back pain had decreased since the injury, she continued to suffer with pain and her physicians were considering placement of a spinal cord stimulator. She also reported to Dr. Ruttle that she had weakness and paresthesias in her upper extremities. Paresthesia means "[a] skin sensation, such as burning, prickling, itching, or tingling, with no apparent physical cause." American Heritage Stedman's Medical Dictionary (2002).

[¶12] With regard to her lumbar spine, Dr. Ruttle reported that Ms. Morris complained of bilateral low back muscle pain radiating into the right buttock. She also complained of thigh pain radiating to her knees, which was worse on the left than the right. Dr. Ruttle stated in his report:

> The patient's physical examination today reveals limitation of neck and lumbar spine range of motion, all planes tested. The remainder of the patient's examination is completely normal. Arm and forearm circumferences are equal in upper extremities. Thigh and calf circumferences are equal in lower extremities. Neurological examination is completely normal in upper and lower extremities.
>
> There is no objective evidence to support neurological complaints of on-going symptoms in right and left upper and lower extremities in this patient.

Dr. Ruttle concluded that Ms. Morris's fusions appeared to have healed and she was "capable of returning to prior job activities" with certain lifting limitations. He said her "subjective complaints appear completely out of proportion to objective findings," and there was no evidence of "ongoing radiculopathy." Radiculopathy is defined as:

> significant alteration in the function of a single or multiple nerve roots and is usually caused by mechanical or chemical irritation of one or several nerves. The diagnosis requires clinical findings including specific dermatomal distribution of pain, numbness, and/or parasthesias. Subjective reports of sensory changes are more difficult to assess; therefore, these complaints should be consistent and supported by

other findings of radiculopathy. There may be associated motor weakness and loss of reflex. A root tension sign is usually positive. The identification of a condition that may be associated with radiculopathy (such as a herniated disk) on an imaging study is not sufficient to make a diagnosis of radiculopathy; clinical findings must correlate with radiographic findings in order to be considered.

*Hurt v. State of Wyo., ex rel. Dep't of Workforce Servs., Workers' Safety & Comp. Div.,* 2015 WY 106, ¶ 19, 355 P.3d 375, 381 (Wyo. 2015), quoting the *AMA Guides to Evaluation of Permanent Impairment, Sixth Edition* (hereinafter *AMA Guides*).

[¶13] Dr. Ruttle stated there was no indication for a spinal cord stimulator, but that if a spinal cord stimulator was considered, he "strongly recommended that [Ms. Morris] undergo a thorough psychologic evaluation to assess for psychological barriers to recovery." Dr. Ruttle applied the *AMA Guides* and concluded that Ms. Morris had permanent impairment of five percent (5%) of the whole person for her cervical spine and six percent (6%) of the whole person for her lumbar spine, resulting in a total whole person impairment rating of eleven percent (11%). Based on Dr. Ruttle's evaluation, the Division issued a final determination on November 13, 2012, terminating Ms. Morris's TTD benefits as of November 7, 2012.

[¶14] On November 21, 2012, Ms. Morris apparently saw Melissa Jenkins, Ph.D. for a psychological evaluation. Although that evaluation was not included in the record provided to the Commission, Dr. Ruttle reviewed Ms. Jenkins' evaluation in a subsequent report. The evaluation stated that Ms. Morris had "'marked risks' for rating high pain sensitivity and catastrophizing pain symptoms." However, Ms. Jenkins concluded Ms. Morris's "prognosis for postsurgical outcome" was good and "provided a favorable recommendation for placement of a spinal cord stimulator." On November 30, 2012, Dr. Hammond submitted a request to the Division for preauthorization of a spinal cord stimulator trial for Ms. Morris.

[¶15] On December 17, 2012, Dr. Kopitnik's PA examined Ms. Morris and reviewed

the results of a myelogram which showed fusion at both surgical areas and no adjacent disc disease in either area. However, the PA stated that Ms. Morris was "pretty miserable," so they were "trying to get Workers' Comp. to [ap]prove a spinal cord stimulator trial in an effort to relieve her pain and hopefully get her back to work at some capacity." He recommended a nerve root block injection and referred her to Dr. David Martorano, a psychiatrist with board certification in addiction, for his "input and treatment options." Barry Beutler, M.D. performed a left S1 nerve root block for diagnostic and therapeutic purposes that same day.

[¶16] On January 24, 2013, the Division denied Dr. Hammond's request for preauthorization of a spinal cord stimulator trial for Ms. Morris. On January 28, 2013, Dr. Kopitnik's PA saw Ms. Morris again. His notes indicate that the S1 injection by Dr. Beutler relieved her "leg pain completely and her low back pain for about 3 weeks." However, the PA stated that Ms. Morris continued to require daily narcotic pain medications, muscle relaxants and anti-inflammatories. He stated that there was not a lot more to be done from a neurosurgical standpoint. The PA said he would double check with Dr. Martorano because Ms. Morris had not yet been contacted by his office and would wait on a "clear" decision from the Division regarding the spinal cord stimulator.

[¶17] Ms. Morris requested a second opinion on her PPI rating and was seen by Dr. Ricardo Nieves on February 21, 2013. After examining Ms. Morris and reviewing her medical records, Dr. Nieves listed her diagnoses as: 1) status post cervical and lumbar spine fusions; 2) non-verifiable radicular complaints; and 3) subjective complaints out of proportion to the objective findings, suggesting "inappropriate illness behavior." He concluded Ms. Morris had reached MMI, no additional surgical procedures were needed, and a spinal cord stimulator was not indicated because there was no finding of radiculopathy and her psychiatric state was unstable. Dr. Nieves rated Ms. Morris's PPI as 11% of the whole person. Given both PPI ratings

were 11% of the whole body, the Division issued a final determination with that rating.

[¶18] Over the next several months, Ms. Morris received more injections in her lumbar and cervical spine from Dr. Beutler. Dr. Nino Dobrovic took over her pain management care in the summer of 2013. On July 25, 2013, Dr. Dobrovic treated Ms. Morris with cervical and lumbar spine injections. At a follow-up appointment on August 5, 2013, Dr. Dobrovic was puzzled because Ms. Morris "derived no benefit and paradoxically reported increased pain about the neck and back despite the fact that anesthetics had been used" in the injections. He also noted that, despite her reports of continuing pain, the lumbar fusion was in "excellent alignment" and she is "neurologically intact." Dr. Dobrovic also treated Ms. Morris's lumbar spine with rhizotomy (cauterization of the nerves).

[¶19] Although Ms. Morris had been referred to a psychiatrist, Dr. Martorano, in December 2012, she saw him for the first time on August 9, 2013. His notes from that visit stated that she had "a history of worsening depression since an injury." Dr. Martorano stated in his deposition that he had trouble treating Ms. Morris because she did not provide medical records to him early on and she was a "difficult historian" and hard to engage. Ultimately, he recommended that she be admitted for in-patient psychiatric care, which she refused.

[¶20] Dr. Martorano attempted to help Ms. Morris with her pain and mental problems but, after a few visits, she stopped coming to see him. When asked about his recommendation with regard to the spinal cord stimulator, he stated that she had not mentioned that proposed treatment during her visits with him. However, he opined that, without inpatient psychiatric hospitalization, she was not a suitable candidate for a spinal cord stimulator.

[¶21] Ms. Morris saw a doctor for a right knee problem on July 9, 2012, apparently generating a single $85 worker's compensation claim for evaluation of her knee. The Division denied the claim as unrelated to the work injury. She objected, claiming she had knee pain and inflammation from kneeling because the lower back fusion prevented her

from bending over. Ms. Morris also objected to the Division's final determinations terminating her TTD benefits effective November 7, 2012, denying the spinal cord stimulator, and rating her PPI at 11% of the whole person.

[¶22] All four issues were referred to the Commission for a contested case hearing. Ms. Morris testified at the hearing, and the Commission reviewed her medical records, the deposition testimony of Drs. Kopitnik, Hammond, Dobrovic, Martorano, and Nieves, and Dr. Ruttle's and Dr. Nieves's independent medical evaluations which included their impairment ratings. The Commission ultimately upheld all of the Division's determinations. Ms. Morris filed a timely petition for review, and the district court affirmed the Commission's decision. She filed a notice of appeal to this Court.

## STANDARD OF REVIEW

[¶23] When an appeal is taken from a district court's review of an administrative agency's decision, we examine the case as if it came directly from the agency, giving no deference to the district court's decision. *Guerrero v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.,* 2015 WY 88, ¶ 11, 352 P.3d 262, 265 (Wyo. 2015). *See also Dale v. S & S Builders, LLC,* 2008 WY 84, ¶ 8, 188 P.3d 554, 557 (Wyo. 2008). Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2017) governs judicial review of administrative decisions:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶24] In accordance with § 16-3-114(c), we review the agency's findings of fact by applying the substantial evidence standard. "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Guerrero,* ¶ 12, 352 P.3d at 266, quoting *Bush v. State ex rel. Wyo. Workers' Comp. Div.,* 2005 WY 120, ¶ 5, 120 P.3d 176, 179 (Wyo. 2005). "Findings of fact are supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for those findings." *Kenyon v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2011 WY 14, ¶ 11, 247 P.3d 845, 849 (Wyo. 2011).

[¶25] The claimant has the burden of proving all the essential elements of her workers' compensation claims by a preponderance of the evidence. *Phillips v. TIC-The Indus. Co. of Wyo., Inc.,* 2005 WY 40, ¶ 25, 109 P.3d 520, 531 (Wyo. 2005).

If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of

any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it.

*Dale*, ¶ 22, 188 P.3d at 561 (citations omitted). "'We review an agency's conclusions of law *de novo*, and will affirm only if the agency's conclusions are in accordance with the law." *Middlemass v. State ex rel. Wyo. Workers' Safety & Comp Div.*, 2011 WY 118, ¶ 13, 259 P.3d 1161, 1164 (Wyo. 2011).

### DISCUSSION

[¶26] Although there were other issues before the Commission, Ms. Morris presents only two issues in her appeal to this Court. She claims the Commission erred by concluding: 1) she was not entitled to further TTD benefits because she had reached MMI; and 2) her right knee problem was not causally related to her work injury.

*1. Did the Commission err by concluding Ms. Morris was at maximum medical improvement and no longer qualified for temporary total disability benefits?*

[¶27] Under Wyoming workers' compensation law, the concepts of temporary total disability, maximum medical improvement, ascertainable loss, and permanent partial impairment are interrelated. Wyo. Stat. Ann. § 27-14-404 governs TTD and states in relevant part:

(a) If after a compensable injury is sustained and as a result of the injury the employee is subject to temporary total disability as defined under W.S. 27-14-102(a)(xviii), the injured employee is entitled to receive a temporary total disability award for the period of temporary total disability as provided by W.S. 27-14-403(c). . . .

Temporary total disability is defined at § 27-14-102(a)(xviii) as:

that period of time an employee is temporarily and totally incapacitated from performing employment at any gainful employment or occupation for which he is reasonably suited by experience or training. The period of temporary total disabili-

ty terminates at the time the employee completely recovers or qualifies for benefits under W.S. 27-14-405 or 27-14-406[.]

[¶28] "The purpose of temporary total disability benefits is 'to provide income for an employee during the time of healing from his injury and until his condition has stabilized.'" *Phillips*, ¶ 27, 109 P.3d at 532, quoting *Pacific Power & Light v. Parsons*, 692 P.2d 226, 228 (Wyo. 1984). Under § 27-14-404(c)(ii), TTD benefits cease when:

(ii) The employee has an ascertainable loss, qualifies for benefits under W.S. 27-14-405 or 27-14-406 and the first monthly payment pursuant to either of those sections has been issued to the employee.

Wyo. Stat. Ann. § 27-14-405 (LexisNexis 2017) governs permanent partial impairment benefits and states in relevant part:

(f) An injured employee suffering an ascertainable loss may apply for a permanent partial impairment award as provided in this section.

(g) An injured employee's impairment shall be rated by a licensed physician using the most recent edition of the American Medical Association's guide to the evaluation of permanent impairment.

* * *

(m) If the percentage of physical impairment is disputed, the division shall obtain a second opinion and if the ratings conflict, shall determine the physical impairment award upon consideration of the initial and second opinion. Any objection to a final determination pursuant to this subsection shall be referred to the medical commission for hearing by a medical hearing panel acting as hearing examiner pursuant to W.S. 27-14-616.

[¶29] "Ascertainable loss" as used in § 27-14-404(c)(ii) and § 27-14-405(f) means "that point in time in which it is apparent that permanent physical impairment has resulted from a compensable injury, the extent of the physical impairment due to the injury can be determined and the physical impairment will not substantially improve or deteriorate because of the injury." Section 27-14-102(a)(ii). An ascertainable loss is typically measured at

the point of MMI. *State ex. rel. Wyo. Workers' Comp. Div. v. Gerdes*, 951 P.2d 1170, 1174 n. 1 (Wyo. 1997). Wyo. Workers' Comp. Div. Rules, Regulations and Fee Schedules, Ch. 1, § 4(ah) (2011)[1] defined MMI as:

A medical condition or state that is well stabilized and unlikely to change substantially in the next year, with or without medical treatment. Over time, there may be some change; however, further recovery or deterioration is not anticipated. This term may be used interchangeably with the term "ascertainable loss", defined in W.S. § 27-14-102(a)(ii).

[¶30] The Commission concluded that, at the time the Division terminated Ms. Morris's TTD benefits in November 2012, she had an ascertainable loss because she had reached MMI. It explained:

The panel notes that the period of recovery and rehabilitation for Ms. Morris after the lumbar surgery was approximately ten and a half months, and that the evidence generated [at the contested case hearing] indicates that the fusion procedures were both technically successful. ... Unfortunately, Ms. Morris continued to suffer from pain, but we find and conclude that her physical condition as a result of the lumbar fusion procedure had, in fact, reached a level of Maximum Medical Improvement and it was appropriate that she be referred at that time for a Physical Impairment Rating because she was at a level where an ascertainable loss to her injured body parts could be accurately calculated.

In making that determination, the Commission discounted the opinions of Ms. Morris's treating physicians that she was not at MMI and accepted the opinions of the physicians who performed the independent medical evaluations and PPI ratings for the Division, Dr. Ruttle and Dr. Nieves, that she had reached MMI. The Commission explained:

17. The medical panel has closely reviewed all of the expert medical opinions that have been generated at this particular case, and we find that the opinions of Dr.

Nieves and Dr. Ruttle are the most credible and persuasive. Both Drs. Ruttle and Nieves found that Ms. Morris was at a level of Maximum Medical Improvement in approximately November of 2012, approximately 11 months after the lumbar spinal fusion surgery. The radiologic evidence of the fusion clearly indicates that the procedure healed properly, and both the physicians noted the lack of radiologic findings in support of her varied and continued complaints of pain. In addition, both Dr. Ruttle and Dr. Nieves identified psychologic components to Ms. Morris' presentation, which were confirmed by the very direct testimony of Dr. Martorano, who had prepared the psychiatric evaluation regarding Ms. Morris.

Additional treatment is reasonable and warranted, but at this point is palliative care only. The medical panel finds that Ms. Morris was properly rated for physical impairment, and received two essentially identical 11% whole body Permanent Impairment Ratings that reflect the pathology to her cervical and lumbar spine. The fusions healed properly and as expected.

We further find that the opinions of Drs. Kopitnik and Hammond and Dobrovic represent a poor understanding of the Workers' Compensation definition of Maximum Medical Improvement. The *AMA Guides* clearly indicate that a finding of MMI is not predicated on the elimination of symptoms and/or subjective complaints. The medical panel finds further that the management of her ongoing pain is palliative in nature and do[es] not alter the underlying physical impairment of her physical body that was set forth by Drs. Ruttle and Nieves.

[¶31] Ms. Morris claims that the Commission applied the wrong definition of MMI when it referred to the *AMA Guides* instead of the Division's regulatory definition of the term. The commission quoted the definition of MMI from the *AMA Guides* as follows:

5. We note that the [*AMA Guides*] under which Ms. Morris was properly rated, dis-

---

1. The current version of the rule, Wyo. Workers' Comp. Div. Rules, Ch. 1, § 3(dd) (2017), contains the same definition of MMI.

cuss[ ] the concept of Maximum Medical Improvement. Section 2.5e (page 26) Chapter 1, of the *Guides* indicates:

> MMI represents a point in time in the recovery process after an injury when further formal medical or surgical intervention cannot be expected to improve the underlying impairment. Therefore, MMI is not predicated on the elimination of symptoms and/or subjective complaints. Also, MMI can be determined if recovery has reached the stage where symptoms can be expected to remain stable with the passage of time, or can be managed with palliative measures that do not alter the underlying impairment substantially, within medical probability.

The Commission referenced this definition throughout its order.

[¶32] Ms. Morris is correct that the Commission is obligated to follow the regulatory definition adopted by the Division. *See Wilson Advisory Committee v. Board of County Comm'rs*, 2012 WY 163, ¶ 22, 292 P.3d 855, 862 (Wyo. 2012); *Northfork Citizens for Responsible Development v. Board of County Comm'rs of Park County*, 2010 WY 41, ¶ 27, 228 P.3d 838, 848 (Wyo. 2010) (holding administrative regulations have the force and effect of law and the agency is required to follow them). The heart of the definition of MMI in the Division's rules is that the medical condition is "well stabilized and unlikely to change substantially in the next year, with or without medical treatment." Wyo. Workers' Comp. Div. Rules, Regulations and Fee Schedules, Ch. 1, § 4(ah). In *Phillips*, ¶ 33, 109 P.3d at 534, this Court fleshed out the concept of MMI under Wyoming workers' compensation law as follows:

> [¶33] Generally, the commonest question is when does the "healing period" end and "stabilization" occur? The answer to this question—which is sometimes phrased as "when has maximum medical improvement (MMI) been reached?" or "when has the condition become stationary?"—determines in most states when temporary benefits cease and when the extent of permanent disability can be appraised, for purposes of making either a permanent partial or a permanent total award.
>
> . . . .
>
> The issue may be a purely medical one. Thus, there may be medical evidence that the period of recuperation is not yet over, that further healing and strengthening may be anticipated, and that it is still too early to appraise claimant's permanent disability. Conversely, there may be medical testimony that the claimant has recovered as much as he or she ever will, and that any lingering disability is permanent. The fact that some treatment is still necessary, such as physical therapy or drugs, does not necessarily rule out a finding that the condition has become stabilized, if the underlying condition causing the disability has become stable and if nothing further in the way of treatment will improve that condition. But, if treatment was given in the hope of improving the condition, the later discovery that no improvement resulted does not bar a finding that the healing period persisted throughout the process of treatment. The persistence of pain may not of itself prevent a finding that the healing period is over, even if the intensity of the pain fluctuates from time to time, provided again that the underlying condition is stable.
>
> 4 Larson's Workers' Compensation Law § 80.03[2], [3], and [4] (2004) (footnotes omitted).

We concluded that a finding of MMI was appropriate if "substantial improvement" of the underlying condition would not result from further medical treatment. *Id.*, ¶ 36, 109 P.3d at 535.

[¶34] *Phillips'* discussion of the meaning of MMI under Wyoming law incorporates all of the salient aspects of the *AMA* definition. In particular, we stated that MMI exists at the point when substantial improvement of the underlying condition is not expected. This is analogous to the *AMA Guides* statements that a patient has reached MMI when "further formal medical or surgical intervention cannot be expected to improve the underlying impairment" and further management of symptoms "will not alter the under-

lying impairment substantially." We also stated in *Phillips* that the existence of continuing pain and the need to treat that pain does not prevent a finding of MMI. That is consistent with the *AMA Guides'* statement that "MMI can be determined if recovery has reached the stage where symptoms can be managed with palliative measures . . . ." The *AMA Guides'* definition of MMI, therefore, is consistent with Wyoming law and the Commission did not err by using it.[2]

[¶35] Ms. Morris also claims the Commission erred by accepting the Division's experts' opinions over her treating doctors' opinions. When determining whether the Commission's decision is supported by substantial evidence, we have stated:

> "It is the obligation of the trier of fact to sort through and weigh the differences in evidence and testimony, including that obtained from medical experts." *In re Worker's Comp. Claim of David v. State ex rel. Wyo. Workers' Safety and Comp. Div.*, 2007 WY 22, ¶ 15, 151 P.3d 280, 290 (Wyo. 2007). Further, we have noted that "The Commission is in the best position to judge and weigh medical evidence and may disregard an expert opinion if it finds the opinion unreasonable or not adequately supported by the facts upon which the opinion is based." *Spletzer v. Wyo. ex rel. Wyo. Workers' Safety & Comp. Div.*, 2005 WY 90, ¶ 21, 116 P.3d 1103, 1112 (Wyo.2005).

*Willey v. State ex rel. Wyo. Workers' Safety & Comp Div.*, 2012 WY 144, ¶ 18, 288 P.3d 418, 426 (Wyo. 2012). In fact, "[d]etermining whether a claimant is entitled to benefits where, as here, there exists conflicting medical testimony is precisely the purpose for which the Commission was created." *Watkins v. State ex rel., Wyo. Medical Comm'n*, 2011 WY 49, ¶ 25, 250 P.3d 1082, 1091 (Wyo. 2011), citing *French v. Amax Coal West*, 960 P.2d 1023, 1030 (Wyo. 1998). *But see Camilleri v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2010 WY 156, 244 P.3d 52 (Wyo. 2010) (criticizing the Commission's determinations on credibility but upholding its deci-

sion as not against the overwhelming weight of the evidence).

[¶36] Ms. Morris asserts that the Commission improperly failed to give credit to the opinion of Dr. Kopitnik, the surgeon who performed both of her surgeries, that she had not reached MMI. The Commission discounted his opinion because it concluded he misunderstood the concepts of MMI and ascertainable loss in Wyoming workers' compensation law. The record bears this out.

[¶37] Dr. Kopitnik testified in his deposition:

> Q. . . . [L]et me ask you have you ever rendered the opinion that [Ms. Morris] reached maximum medical improvement?
>
> A. I'd have to refer to the record. It would be typical in my practice that after—certainly a year after surgery that I would give the opinion that it would be unlikely to have further recovery and so the Workman's Compensation Division typically asks us to sign a form attesting that very little improvement is likely to occur and very little, if any, other surgical treatment is likely to occur so the patient has probably reached what their (sic) maximum improvement is going to be so I would need to just check our record, see if I made that attestation for [MMI]. I don't have a recollection one way or the other with Ms. Morris.
>
> Q. Can you determine that for me, please?
>
> A. Let's see if we can find it in the record. I don't see any of our forms that would be consistent that I'm familiar with with the Workman's Compensation Commission (sic) that I would sign for attesting that she reached [MMI]. I don't see that in the record that I had made that [declaration] in the past—. . . . I don't see any evidence of that.

Dr. Kopitnik confirmed signing Ms. Morris's TTD applications through March 17, 2013.

[¶38] Dr. Kopitnik explained his understanding of MMI and TTD as follows:

---

2.  As noted above, § 27-14-405(g) requires rating of an injured employee's permanent impairment using the *AMA Guides*. Given the *AMA* definition of MMI is consistent with Wyoming law, we do

not need to determine how the legislature's adoption of the *AMA Guides* for PPI ratings would have affected the analysis had the definitions been contradictory.

I think someone can be temporarily disabled but they can't work but they're already at the [MMI] that they're going to make from their treatment. I view [MMI] when I fill out the form for work comp ... is that it's an attestation I do not think there is a reasonable probability—... of any further improvement. It doesn't necessarily in my book mean that they can't go back to work. It's just means I'm attesting I don't think they're going to get any better than what they are now. So if someone has no repairable anatomic problem and they're still having some pain and they can't work and they need some more time before they go back to work, I don't think legally—I'm not a lawyer, but I don't think that that means that they can't be temporarily disabled despite the fact that they have reached their maximum improvement. ...

Dr. Kopitnik was then questioned about his understanding of the term "ascertainable loss." He said that Ms. Morris had probably reached the point where her condition would not substantially improve or deteriorate but did not believe the extent of her impairment could be determined. He qualified his position several times, however, by stating that he does not do "disability ratings."

[¶39] We agree with the Commission that Dr. Kopitnik misunderstood, or did not agree with, the meanings of MMI, ascertainable loss, and TTD under Wyoming law. Under § 27-14-404(c)(ii), an injured employee is not entitled to continued TTD benefits if she has an ascertainable loss and qualifies for PPI benefits. An employee has an ascertainable loss if she has reached MMI. The fact that Dr. Kopitnik believed that an injured worker could be entitled to TTD benefits even though she had reached MMI is not consistent with Wyoming law. Under our substantial evidence standard of review, the Commission properly rejected Dr. Kopitnik's testimony and explained its reasons for doing so.

[14] [¶40] Dr. Dobrovic was a physiologist who treated Ms. Morris for pain. He stated that he did not believe Ms. Morris had reached MMI because certain procedures, including further injections and/or rhizotomy, may have been effective in relieving her pain. He testified by deposition as follows:

Q. For the record, tell me what your understanding of MMI is.

A. ... [M]aximum medical improvement. It's basically a term in the Workmen's Compensation world where the determination is made by the treating physician that the patient is not going to get any better, they are as good as they're going to get. Further treatment may palliate, but they're really not going to improve in terms of function. ...

Q. And in your opinion, to a reasonable degree of medical probability, she has not reached that point yet?

A. I don't believe so. And I say that just because I've seen her a limited period of time, and what we've done so far has helped, so I think we can get rid of that [pain] on the left side as well, akin to what helped on the right.

So there's an example of some improvement that could be made. And that's why I expressed that opinion.

After reviewing Dr. Dobrovic's records and testimony, the Commission found that Dr. Dobrovic's statement that Ms. Morris had not reached MMI was incorrect. The record supports this conclusion because his notes reflect that her lumbar fusion was in excellent alignment and she was neurologically intact. Dr. Dobrovic's treatments of Ms. Morris were strictly for pain relief and would not result in any physiological improvement which would warrant delaying Ms. Morris's PPI rating. The Commission's analysis represents proper application of the definition of MMI discussed above, which focuses on the underlying condition rather than pain.

[¶41] Additionally, Ms. Morris argues that the record does not support the Commission's determination that she had reached MMI because Dr. Hammond, an interventional pain specialist, recommended a spinal cord stimulator trial. According to Dr. Hammond, the purpose of the spinal cord stimulator was to treat Ms. Morris's chronic back pain. The Commission upheld the Division's

denial of the spinal cord stimulator[3] and also decided that the recommendation for the spinal cord stimulator did not prevent a finding of MMI because: 1) the stimulator would be used only to treat her pain, not the underlying back condition; 2) Ms. Morris's subjective pain complaints were not supported by objective findings of radiculopathy; and 3) Ms. Morris's psychiatric state contributed to her perceived pain and was not conducive to use of a spinal cord stimulator.

[¶42] The Commission's findings are consistent with the evidence in the record. Ms. Morris's treating doctors agreed that her fusion surgeries were technically successful and she was clinically stable. The spinal cord stimulator would not change the underlying cause of her pain, but, rather, simply stop the brain from recognizing pain signals. In this respect, its purpose was only palliative.

[¶43] The medical evidence also established that the spinal cord stimulator was mostly effective to treat radiculopathy. Although Ms. Morris complained of radiation of pain to her extremities, there were no objective medical findings of neurological radiculopathy. The nerve conduction studies and other tests designed to detect radiculopathy were normal. In addition, Dr. Nieves performed a battery of tests, called Waddell's tests, to determine the legitimacy of her pain complaints. He concluded that the tests showed that her "subjective complaints are out of proportion to objective findings and there are nonorganic non-physiologic findings of positive Waddell's on today's evaluation, which together with a high level of perceived disability as per elevated pain disability questionnaire is suggestive of inappropriate illness behavior." At his deposition, Dr. Nieves explained that Ms. Morris's findings "didn't quite make sense" and "did not have an anatomical physiologic explanation." He stated that the results of his tests were consistent with "symptom magnification" or "the person trying to influence my exam."

[¶44] The Commission also noted that Ms. Morris's psychiatric state played a role in her failure to recover and contraindicated a spinal cord stimulator trial. Dr. Hammond stated that it is standard procedure to require a psychological evaluation prior to treating with a spinal cord stimulator and that the psychologist who examined Ms. Morris, Ms. Jenkins, did not find any mental health conditions that would prevent proceeding with the stimulator trial. However, the psychiatrist who treated Ms. Morris for mental health and pain management problems, Dr. Martorano, stated that he would not recommend a spinal cord stimulator until she had in-patient psychiatric treatment because of his concerns about her mental state. The Commission found Dr. Martorano's opinion more persuasive than Dr. Jenkins' opinion. That determination was appropriate given Ms. Morris was actually treated by Dr. Martorano and he apparently had a much longer relationship with her than did Ms. Jenkins.

[¶45] The Commission appropriately explained why it rejected her treating providers' opinions that she had not reached MMI and, instead, accepted the Division's experts' conclusion that she had. The Commission's determination that the Division properly terminated Ms. Morris's TTD benefits because she had reached MMI is supported by substantial evidence in the record.

### 2. Is the Commission's decision that Ms. Morris's injury to her right knee was not work-related supported by substantial evidence?

[¶46] On July 9, 2012, Ms. Morris saw Dr. Peter Bergquist for pain in her right knee. She denied any specific trauma to her knee and stated that the pain was "hard to localize." Ms. Morris had not previously complained of similar symptoms in the nearly one and a half years since her work accident. Except for "a little bit of pain to palpation at the quadriceps tendon," Dr. Bergquist's examination and the X-rays of the knee were entirely normal, with no swelling or other problems noted. He advised her to ice the knee and take anti-inflammatory medication. The Division denied medical benefits for the knee as unrelated to the February 2011 work injury, and Ms. Morris objected. She stated

3. Interestingly, Ms. Morris does not challenge the Medical Commission's decision upholding

the Division's refusal to preauthorize the spinal cord stimulator.

that her right knee problem was related to the original work injury because the lower back fusion prevented her from bending so she had to kneel instead.

[¶47] The Commission upheld the Division's denial of benefits for Ms. Morris's right knee because she failed to satisfy her burden of proving the knee problem was work-related. A work-related injury may ripen into a condition which requires additional medical attention. *Bodily v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2014 WY 39, ¶ 21, 320 P.3d 240, 245 (Wyo. 2014). However, as with the original injury, the employee must show that her subsequent injury arose "out of and in the course of employment" to be compensable. Section 27-14-102(a)(xi). We explained in *Johnson v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2014 WY 33, ¶ 21, 321 P.3d 318, 323 (Wyo. 2014), that when an employee seeks benefits for a condition that developed after the initial injury, he has the burden of proving a causal connection between the work injury and the injury for which benefits are sought. Medical evidence is typically required to meet this obligation unless the injury or condition is " 'immediately and directly or naturally and probably' the result of the workplace incident." *Guerrero*, ¶ 25, 352 P.3d at 270, quoting *Thornberg v. State ex rel. Wyo. Workers' Comp. Div.*, 913 P.2d 863, 867 (Wyo. 1996).

[¶48] Ms. Morris's right knee pain was not immediately and directly or naturally and probably the result of her work-related injury to her spine. No medical professional testified that Ms. Morris's right knee pain resulted from kneeling because her fusion prevented her from bending. Thus, Ms. Morris failed to meet her burden of proof on causation, and the Commission's decision denying benefits is supported by the record.

[¶49] Affirmed.